## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

HAROLD TOLIVER, an individual;  )
JAMES MCCRINK, an individual;  )
FEDERATED BANK, an Illinois bank,  )
MATT CLARK, an individual;  )
LARRY KOLKO, an individual;  )
RAMONA ROBERSON, an individual;  )
JANICE FAYHEE, an individual; and  )
JACQUELINE BEIRNES, an individual,  )
        )
        Plaintiffs,  )
        )
        v.  )    Civil Action No. 06-796-***
        )
CHRISTINA SCHOOL DISTRICT,  )
THRESA GILES, DAVID SUNDSTROM,  )
and JOSEPH WISE,  )
        )
        Defendants.  )
-------------------------------------------------------)
CHRISTINA SCHOOL DISTRICT,  )
        )
        Third-Party Plaintiff,  )
        v.  )
        )
SCIENTIFIC LEARNING  )
CORPORATION,  )
        )
        Third-Party Defendant.  )

### DEFENDANT AND THIRD PARTY PLAINTIFF CHRISTINA SCHOOL DISTRICT'S ANSWERING BRIEF IN OPPOSITION TO THIRD-PARTY DEFENDANT SCIENTIFIC LEARNING CORPORATION'S MOTION TO DISMISS

David H. Williams (#616)
dwilliams@morrisjames.com
James H. McMackin, III (#4284)
jmcmackin@morrisjames.com
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900/5849
Attorneys for Defendant and Third-Party
 Plaintiff Christina School District

Dated:  January 17, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

NATURE AND STAGE OF THE PROCEEDINGS ............................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 1

ARGUMENT .................................................................................................................. 2

    I.     THE MOTION TO DISMISS STANDARD ............................................................... 2

    II.    THE MOTION MUST BE DENIED BECAUSE THE CONTRACTS
          DO NOT IDENTIFY WHAT HAPPENS TO FUNDS PAID FOR
          SERVICES WHICH WERE NEVER PROVIDED AND NEVER
          WILL BE PROVIDED ......................................................................................... 2

    III.   THE MOTION MUST BE DENIED BECAUSE THIS IS NOT A
          CASE OF BUYER'S REMORSE ........................................................................... 4

CONCLUSION ............................................................................................................... 4

# UNREPORTED CASES

**TAB**

*Bakerman v Sidney Frank Importing Co., Inc.*,
   2006 WL 3927242 (Del. Ch. 2006) ............................................................................. A

*Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.*,
   1997 WL 529587 (Del. Super. Ct. 1997) ..................................................................... B

*Fitzgerald v. Cantor*,
   1998 WL 326686 (Del. Ch. 1998) .............................................................................. C

# TABLE OF AUTHORITIES

**Page**

*Bakerman v Sidney Frank Importing Co., Inc.*,
  2006 WL 3927242 (Del.Ch. 2006) ......................................................................................2

*Conley v. Gibson*,
  355 U.S. 41 (1957)..............................................................................................................2

*Fitzgerald v. Cantor*,
  1998 WL 326686 (Del. Ch. 1998) ......................................................................................3

*In re Quintus Corporation*,
  353 B.R. 77 (Bankr. D. Del. 2006) .....................................................................................3

*Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.*,
  1997 WL 529587 (Del. Super. Ct. 1997)............................................................................3

*Kost v. Kozakiewicz*,
  1 F.3d 176 (3d Cir.1993).....................................................................................................2

*Morse v. Lower Merion Sen. Dist.*,
  132 F.3d 902 (3d Cir.1997).................................................................................................2

*Resource Ventures, Inc. v. Resources Management Int'l, Inc.*,
  42 F. Supp. 2d 423 (D. Del. 1999)......................................................................................2

Defendant and Third Party Plaintiff Christina School District (the "District") opposes the motion to dismiss (the "Motion") submitted on behalf of Third-Party Defendant Scientific Learning Corporation ("SLC") and responds as follows:

## NATURE AND STAGE OF THE PROCEEDINGS

The District does not take exception to the Nature and State of the Proceedings set forth in the Motion.

## SUMMARY OF ARGUMENT

The District's unjust enrichment claim must not be dismissed where, as here, the governing contract does not address the subject matter of the dispute.

## STATEMENT OF FACTS

The District placed a series of orders for various software products and services from SLC commencing in September 2003. Funding for the transactions was provided under a Master Lease Purchase Agreement between the District and Ed Beck & Associates ("EBA") dated September 12, 2003 (the "Agreement."). (B1-B7)[1] On September 16, 2003, the District placed an order for $414,225. (B9) On October 13, 2003, the District placed an order for $69,150. On June 28, 2004, the District placed an order for $841,371. (B19) Lastly, on June 15, 2005, the District placed an order for $1,011,781. (B28) In October, 2004, the District paid to SLC $333,380 for training and consultant services. (B33-B34).

The Agreement can be terminated pursuant to Section 6 in the event there are insufficient funds for the District to make annual payments. On August 17, 2006, the District provided notice of intent to terminate the Agreement as a result of a well-publicized financial deficit. As a

---

[1] Citations to the Appendix are referred to as "B___".

1

consequence of the termination of the Agreement, the aforementioned training and consultant services will not be fully rendered.

## ARGUMENT

### I.    THE MOTION TO DISMISS STANDARD

The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). To that end, a Rule 12(b)(6) motion should be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The court must assume all factual allegations in the District's Third-Party Complaint are true and must draw all reasonable factual inferences in the light most favorable to the District. *Morse v. Lower Merion Sen. Dist.*, 132 F.3d 902, 906 (3d Cir.1997).

### II.    THE MOTION MUST BE DENIED BECAUSE THE CONTRACTS DO NOT IDENTIFY WHAT HAPPENS TO FUNDS PAID FOR SERVICES WHICH WERE NEVER PROVIDIED AND NEVER WILL BE PROVIDED

SLC contends the District may not recover for unjust enrichment and relies upon a number of cases which stand for the proposition that unjust enrichment may not be pursued unless there is an absence of a formal contract. In each of the cases cited by SLC for this proposition, an express contractual provision governed the dispute and barred a recovery for unjust enrichment. First, in *Resource Ventures, Inc. v. Resources Management Int'l, Inc.*, 42 F. Supp. 2d 423 (D. Del. 1999), the Court found an unjust enrichment claim could not be pursued when the contract governed the obligations involved in the lawsuit. Second, in *Bakerman v Sidney Frank Importing Co., Inc.*, 2006 WL 3927242 (Del.Ch. 2006)[2], an unjust enrichment

---

[2] Unreported cases are attached in the order in which they appear.

claim was dismissed because an express, enforceable contract controlled the parties' relationship. The specific issues in contention (compensation allocation amount and the approvals necessary for disbursement of compensation) were set forth in the governing contract. Third, in *Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.*, 1997 WL 529587 (Del. Super. Ct. 1997), a motion for summary judgment dismissing an unjust enrichment claim was granted because a formal contract governed the issue in dispute. Lastly, the Court in *In re Quintus Corporation*, 353 B.R. 77 (Bankr. D. Del. 2006) made a similar finding that the issues in contention were exclusively governed by the parties' agreement. These cases are distinguished because, in each case, the parties' dispute was governed by the parties' agreement. Here, such is not the case.

SLC's entire argument is premised upon the existence of the Agreement and the three order forms dated September 16, 2003, October 13, 2003, and June 15, 2005 (the "Orders," and collectively with the Agreement, the "Contracts"). While the Contracts set out in detail the parties' rights and obligations concerning other issues, the Contracts do not define or even touch upon the parties' rights and obligations with respect to paid-for, but unrendered, support services. The Contracts are wholly silent on this critical issue.[3] In a case such as this where a valid contract exists, but the contract does not address the issue in dispute between the parties, an unjust enrichment claim may be pursued, and thus, the Motion must be denied. *See Fitzgerald v. Cantor*, 1998 WL 326686 at *6 (Del. Ch. 1998) (denying a motion to dismiss a claim for unjust enrichment and stating "unless and until this Court determines that the defendants' obligations are governed exclusively by contract, Plaintiff has properly stated a claim for unjust enrichment.").

---

[3] Nowhere in the Motion does SLC argue that, by implication or otherwise, the Contracts address the issue of the unrendered support services. Instead, SLC points out that "There is no right to a refund enumerated in the contract." (Opening Brief at 7) Importantly, the converse is also true- there is no prohibition of a refund enumerated either.

### III.   THE MOTION MUST BE DENIED BECAUSE THIS IS NOT A CASE OF BUYER'S REMORSE

SLC portrays this case as a matter of "buyer's remorse." (Opening Brief at 7) Although the cause of the District's termination of the Agreement on August 17, 2006 is not relevant for purposes of the Motion, the District terminated the Agreement because of a significant financial deficit not due to dissatisfaction with the product.

### IV.   CONCLUSION

For the foregoing reasons, the Motion must be denied.

David H. Williams (#616)
dwilliams@morrisjames.com
James H. McMackin, III (#4284)
jmcmackin@morrisjames.com
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
Dated:  January 17, 2008          (302) 888-6900/5849

1642474/1                                    4

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

HAROLD TOLIVER, an individual;           )
JAMES MCCRINK, an individual;            )
FEDERATED BANK, an Illinois bank,        )
MATT CLARK, an individual;               )
LARRY KOLKO, an individual;              )
RAMONA ROBERSON, an individual;          )
JANICE FAYHEE, an individual; and        )
JACQUELINE BEIRNES, an individual,       )
                                         )
      Plaintiffs,                  )
      v.                           )    Civil Action No. 06-796-***
                                         )
CHRISTINA SCHOOL DISTRICT,               )
THRESA GILES, DAVID SUNDSTROM,           )
and JOSEPH WISE,                         )
                                         )
      Defendants.                  )
-------------------------------------------------------)
CHRISTINA SCHOOL DISTRICT,               )
                                         )
      Third-Party Plaintiff,       )
      v.                           )
                                         )
SCIENTIFIC LEARNING                      )
CORPORATION,                             )
                                         )
      Third-Party Defendant.       )

## CERTIFICATE OF ELECTRONIC FILING

     I, James H. McMackin, III, hereby certify that on January 17, 2008, I electronically filed the attached **DEFENDANT AND THIRD PARTY PLAINTIFF CHRISTINA SCHOOL DISTRICT'S ANSWERING BRIEF IN OPPOSITION TO THIRD-PARTY DEFENDANT SCIENTIFIC LEARNING CORPORATION'S MOTION TO DISMISS** with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Patricia Smink Rogowski, Esquire
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE  19899

Jennifer Gimler Brady, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801

and by United States Mail, postage prepaid on the following party:

Thresa Giles
11685 Blackstone River Drive
Jacksonville, FL  32256

_____
David H. Williams (#616)
dwilliams@morrisjames.com
James H. McMackin, III (#4284)
jmcmackin@morrisjames.com
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
Dated:  January 17, 2008            (302) 888-6900/5849

**TAB A**

Citation/Title
2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

**\*3927242**     UNPUBLISHED OPINION.  CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Bruce M. BAKERMAN, Plaintiff,

v.

SIDNEY FRANK IMPORTING CO., INC., Estate of Sidney E. Frank, Lee R. Einsidler, John R. Frank. Stuart W. Moselman, William F. Thompson, and Thomas Bruno, Defendants,

**and**

GREY GOOSE BOTTLING CO., L.L.C., Nominal Defendant.

**No. Civ.A. 1844-N.**
Submitted Aug. 31, 2006.

Decided Oct. 10, 2006.

Revised Oct. 16, 2006.

Norman Monhait, of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware, William T. Reid, IV, Lisa Tsai, and Eric D. Madden, of Diamond Mccarthy Taylor Finley & Lee, LLP, Austin, Texas, and Eric D. Madden, of Diamond Mccarthy Taylor Finley & Lee, LLP, Dallas, Texas, for Plaintiff, of counsel.

Stephen C. Norman, of Potter Anderson & Corroon LLP, Wilmington, Delaware, Jay W. Waks, Gregory J. Wallance, Christine A. Neagle, and William Poorten, of Kaye Scholer LLP, New York, New York, for Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.

**\*\*1**  In 2000, a company's chief legal counsel was granted a membership interest in a non-wholly owned subsidiary.  Four years later, the company negotiated a multi-billion dollar sale of it and its subsidiary's assets to a third party that required the unanimous consent of the subsidiary's members.  After receipt of such consents, the transaction was consummated.  One month following the sale, the chief legal counsel to the parent was terminated.  He has since brought this lawsuit, claiming among other things that the managers of the subsidiary breached their fiduciary duty by abdicating nearly all of the consideration paid by the third party acquiror to the subisidiary's parent.  In addition, he alleges that his consent as a member of the subsidiary was coerced.

Before me is defendants' motion to dismiss the complaint.  For the reasons set forth below, the motion is granted in part and denied in part.  Part I of this Opinion sets out the factual background that gave rise to this lawsuit.  Part II delineates plaintiff's claims, defendants' responses to those claims, and the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

standard to be applied at this stage of the proceedings.  Part III examines and applies the legal principles governing each claim.  This Part concludes that two claims, for tortious interference with contract and for unjust enrichment, must be dismissed.  The remaining claims--direct and derivative claims related to fiduciary breaches and to contractual breaches--all survive the defendants' challenge at this stage.  Finally, Part IV summarizes the conclusions.

## I. FACTUAL BACKGROUND

As required, the facts are drawn from the complaint, the documents it incorporates, and facts not subject to reasonable dispute.  (FN1)

*A. The Makings of a Superpremium Vodka*

Sidney Frank began working in the liquor business for his in-laws in the 1940's and for thirty years sold Scotch all over the world.  After a falling out with the family in 1972, Sidney Frank formed Sidney Frank Importing Co.  ("SFIC").  SFIC purchased the U.S. rights to a brandy and a then little-known German sipping liqueur called Jägermeister and plodded on until the mid-1980's, when Frank discovered a bar in New Orleans that served shots of chilled Jägermeister.  Promoting chilled shots of Jägermeister in college bars, and sending out teams of models to college barrooms to sell and dispense the shots and other merchandise, SFIC began enjoying a period of relative success and created a network of solid relationships with major liquor distributors throughout the country that would later prove very useful.

SFIC was not alone in creating sensations in the liquor market.  In 1979, a Swedish distillery repackaged its vodka into a clear Swedish medicine bottle with crisp blue lettering.  With the help of an original and hugely popular ad campaign, Absolut launched vodka from a well drink to a hip drink.  Over fifteen years later, following on a more recent trend in the mid-1990's of superpremium vodkas offered in frosted bottles, Sidney Frank decided to launch his own superpremium vodka.

**\*\*2**  In the late 1990's, however, SFIC was merely a liquor distribution company, which had built its fortune as the U.S. distributor of Jägermeister.  SFIC enlisted the help of H. Mounier ("Mounier"), a company already engaged in liquor production in the Cognac region of France.  Mounier concocted and developed the formulas and production processes for Grey Goose Vodka, using water that had been filtered through champagne limestone from the Gentè Springs of Cognac, France.  SFIC developed a distinctive bottle that was frosted and taller than the rest, with a cutaway of geese in flight, and the French flag.

Mounier, as the exclusive manufacturer of Grey Goose Vodka, began full-scale production in 1997.  SFIC, in turn, imported and distributed Grey Goose Vodka, primarily in the United States, the only major market at the time.  During 1997, the first year of production, SFIC sold only about 45,000 cases of Grey Goose Vodka.  In 1998, Grey Goose Vodka received the number one vodka rating from the Beverage Testing Institute, a company that produces Consumer Reports-style

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

rankings of alcoholic beverages.  By 1999, sales were up to 190,000 cases.  SFIC continued to market Grey Goose Vodka as one of the best vodkas in the world, and as a result of the ensuing success, Mounier began producing flavored versions of the vodka, including orange, citrus, and vanilla variations.

*B. Problems with Mounier and the Creation of the LLC and SAS*

   Throughout this time period, SFIC and Mounier operated without any written contract between them.  Mounier considered its relationship with SFIC to be a partnership, while SFIC claimed sole rights to the formulas and production processes for Grey Goose Vodka.  In September 1999, Mounier's corporate parent filed for bankruptcy protection in France.

   In November 1999, Sidney Frank hired Bakerman to serve as his special assistant at SFIC.  Several months later, Sidney Frank promoted Bakerman, a licensed attorney, to the position of SFIC's Chief Legal Counsel.  Shortly after joining SFIC, Bakerman developed a strategy that would protect and enhance SFIC's and Sidney Frank's interests in Grey Goose Vodka, while also minimizing their potential tax and other liability exposure.

   On May 22, 2000, Bakerman, Sidney Frank and Lee Einsidler (collectively, the "Founding Members"), formed Grey Goose LLC (the "LLC").  The LLC served as the holding company for a second company formed in July 2000, Grey Goose Bottling France S.A.S.  ("SAS"), which would acquire Mounier's interests in the formulas and productions processes for Grey Goose Vodka.  The Founding Members intended for the LLC and SAS to generate their own significant profits from the production and sale of vodka.

   The SAS bylaws charged management to the individual managers of the LLC; any transfer, assignment or other action with respect to the intellectual property rights of SAS, however, required the approval of the LLC itself.  On August 2, 2000, the Founding Members approved the issuance of membership units in the LLC as follows:

   **3  According to the LLC's Articles of Organization, the members received their ownership interests due to "their individual efforts and work in organizing the [LLC]," which represented "full and satisfactory consideration for their respective Membership Interests ." On more than one occasion, Bakerman communicated to Sidney Frank and Lee Einsidler that he had a potential conflict of interest in obtaining a membership interest in the LLC. Independent legal counsel, White & Case LLP, advised SFIC and the LLC throughout the formation of the LLC and did not object to Bakerman's membership in the LLC.

   The LLC's Operating Agreement contained several important riders, the most important of which required the unanimous written consent by the members for, among other things, any sale of all or substantially all of the LLC's business or assets.

   During the next few years, SAS operated as a subsidiary of SFIC (controlled

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

through the LLC).  SAS obtained the trademark and trade dress of Grey Goose Vodka
in approximately 40 countries.  Finally resolving the dispute with Mounier in
2002, SAS secured complete control of the production process and rights in the
formula for Grey Goose Vodka.  SAS further received significant controls over
Mounier's actual production of the vodka.  With the dispute resolved, SAS entered
into numerous distributorship agreements for Grey Goose Vodka in countries
throughout the world, including Australia, China, Hong Kong, Greece, Italy,
Russia, and the United Kingdom.

*C. Exponential Growth and the Bacardi Sale*

  Sales of Grey Goose Vodka increased exponentially between 1999 and 2004.  In
1999, SFIC sold approximately 190,000 cases of the vodka.  In 2003 SAS sold more
than 2.3 million cases of Grey Goose Vodka.  SFIC estimated that SAS would sell
nearly 3 million cases in 2004.  SAS sold most of its production to SFIC for
distribution in the United States.  Plaintiff alleges that the transfer price
(from SAS to SFIC) sorely undervalued the cases of vodka.  SAS received only a
few dollars per case from SFIC, but SFIC received as much as $72 per case from
its arm's-length sales of the vodka in various international markets.
Nonetheless, even with these allegedly depressed transfer prices on the bulk of
its sales, SAS had annualized net income of approximately $2.5 million as of June
2004.

  The success of Grey Goose Vodka and other superpremium vodkas did not go
unnoticed by the larger spirits companies.  After a period of confidential
negotiations, SFIC signed a letter of intent on March 2, 2004, to sell the Grey
Goose Vodka business to Bacardi, the world's largest privately held spirits
company.  The negotiations proceeded over the course of the next three months and
were largely handled by SFIC executives and outside counsel, to the exclusion of
Bakerman.

*D. The Allocation and Bakerman's Consent*

  Only in early June was Bakerman informed of the imminent sale to Bacardi.  On
June 17, Bakerman asked William Presti, an SFIC officer and in-house counsel who
had participated in the Bacardi negotiations, about the purchase price
allocation.  Presti responded that he believed that one-third of the proceeds
would be allocated to each of the three entities.  While such a symmetrical
allocation may have been the earliest plan, a number of factors favored an
allocation advantageous to SFIC.

  **\*\*4**  First, any portion of the purchase price allocated to SAS would be subject
to a host of taxes under French law, including a French transfer tax, which would
be higher than U.S. taxes and would reduce the overall proceeds obtained from the
sale.

  Second, Sidney Frank himself, the controlling shareholder of SFIC, which in
turn controlled the LLC and SAS, would receive $0.70 on the dollar for proceeds
to SFIC but only $0.475 on the dollar for proceeds to the LLC.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

Third, two LLC members, Bakerman and Linda Rodman, (FN2) held shares only in the LLC and did not hold any shares in SFIC.  All the other members of the LLC either owned equity in SFIC previously, or had received equity in SFIC pursuant to SFIC's "Stock Warrant Plan for Key Employees" (the "Warrant Plan").  Therefore, while allocations to the LLC would have to be shared with these two LLC members, allocations to SFIC could exclude these two LLC members.

On June 18, 2004, one day after Presti discussed the allocation with Bakerman, and shortly before the scheduled public announcement of the Bacardi sale, Lee Einsidler, on behalf of defendants, asked Bakerman, as a member of the LLC, to sign a unanimous written consent of the members.  The consent would authorize the LLC to sell all of SAS's interests in the Grey Goose Vodka product line to Bacardi.  After reviewing the consent, Bakerman repeatedly asked for, and eventually received, what was identified as the current draft of the Asset Purchase Agreement between SFIC, the LLC, SAS, and Bacardi (the "APA").  Under the draft APA, the cash portion of the purchase price would be allocated among the sellers as follows:

1. $2.24 billion to SFIC for "[t]rademark for US, Canada and other markets and production know-how, recipes, formulas and any other production related intangible";

2. $200,000 to SAS for "[t]rademark for France and some other countries";

3. $5.5 million to SAS for the Production Facility in France;

4. $5.4 million to SAS for machinery and other assets in France; and

5. undetermined amounts to SFIC and SAS for inventory.

In addition, under the draft APA, SAS was to receive only about $11 million of the approximately $2.25 billion cash purchase price--less than 0.49% of the purchase price.

Bakerman did not think that the allocation reflected the true value of the LLC and SAS.  Bakerman proposed to Einsidler, John Frank, and Moselman that SAS's allocation should be greatly increased.  When this proposal was roundly rejected, Bakerman responded that he would not sign the consent due to the apparent misallocation of the purchase price.  Bakerman then attempted to contact Sidney Frank, who was out of the SFIC office that day.  Einsidler, however, intervened and instructed him not to call Sidney Frank.

Einsidler brought Bakerman into an office for a meeting with several SFIC executives, including Moselman and John Frank.  The executives repeatedly asserted that SAS had received its fair share of the purchase price allocation under the draft APA.

**5  Einsidler then convened a private meeting with the SFIC executives.  After that meeting, Einsidler told Bakerman that "the lawyers" believed that: (a)

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

Bakerman had a "major conflict of interest" based upon his dual role as SFIC's in-house legal counsel and as a member of the LLC; and (b) Einsidler could act on behalf of the LLC, with or without Bakerman's consent to the transaction. Einsidler then delivered an ultimatum to Bakerman. He stated that Bakerman had less than half an hour to make one of three choices:

   a.  Bakerman could sign the consent, keep his employment at SFIC, and receive $700,000 (similar to the bonuses that all SFIC employees would receive upon the closing of the sale with Bacardi);

   b. Bakerman could sign the consent, resign his employment at SFIC, and receive $1,000,000 in severance from SFIC; or

   c. Bakerman could refuse to sign the consent, have his employment terminated by SFIC, and be sued by SFIC.

   Einsidler added that if Bakerman failed to choose one of these three options within the allotted time, then the third option would be chosen for him.

   Bakerman initially responded that he would sign the consent with an express caveat related to his disagreement over the purchase price allocation.  Einsidler promptly rejected that proposal, stating that the lawyers required the consent to be signed as drafted.

   Bakerman returned to meet with Einsidler and the other SFIC executives, and told them that he needed to keep his job and, therefore, would sign the consent if they really wanted him to stay at SFIC.  Bakerman and each of the defendants who were members of the LLC signed the consent.  It is unclear whether Rodman ever signed the consent.

   Two days later, on June 20, 2004, Bacardi announced the agreement to acquire Grey Goose Vodka.  On June 25, 2004, SFIC, the LLC, SAS, and Bacardi signed the APA, pursuant to which Bacardi agreed to pay approximately $2.25 billion in cash, plus up to $300 million through an earn-out arrangement, to purchase the assets related to the Grey Goose Vodka line.  The sale to Bacardi closed formally on August 3, 2004.

   Three weeks later, on August 24, 2004, Einsidler informed Bakerman that he was being immediately terminated as an SFIC employee because he allegedly had been very unprofessional on the day that he signed the consent.  Einsidler requested that Bakerman sign a comprehensive release in conjunction with his termination. Bakerman refused to sign such a release, and Einsidler asked a security officer to escort Bakerman from the SFIC offices.

   Following the termination, Einsidler called Bakerman on two occasions to persuade Bakerman to sign the release.  During the second call, Einsidler told Bakerman that his refusal to sign the release must mean that he was planning to sue defendants.  Bakerman did nothing to disabuse him of that notion.  Einsidler was, in fact, correct.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

Approximately sixteen months after his termination, and eighteen months after the Bacardi transaction was announced, Bakerman filed a complaint in this Court against defendants on December 15, 2005. Bakerman asserted both direct claims on his own behalf and derivative claims on behalf of the LLC challenging the transfer pricing paid by SFIC to the LLC, the allocation of the Bacardi transaction proceeds, and the alleged coercion that resulted in Bakerman's signing the consent.

**\*6** On March 13, 2006, defendants moved to dismiss the complaint. Among the myriad defenses presented, defendants argued that Bakerman's original interest in the LLC was void due to a conflict of interest that was never correctly consented to by Sidney Frank and SFIC.

Bakerman exercised his right to amend the complaint, (FN3) and filed his first amended complaint on April 27, 2006 (the "Amended Complaint"). Among certain additions and clarifications, the Amended Complaint addressed Bakerman's alleged acquisition of consent from Sidney Frank and SFIC. The Amended Complaint describes how "[o]n more than one occasion, Bakerman communicated to Sidney Frank and Lee Einsidler that he had a potential conflict of interest in obtaining a membership interest in [the LLC]." Defendant Sidney Frank, however, had passed away in early January 2006, after the original complaint had been filed, but months before the filing of the Amended Complaint.

## II. CONTENTIONS

The Amended Complaint includes five claims: two derivative claims and three putative direct claims. The defendants move to dismiss on a number of grounds.

### A. Derivative Claims

Count I alleges breaches of fiduciary duty against the defendants as members and managers of the LLC. Count V alleges that the defendants have been unjustly enriched at the LLC's expense.

### B. Direct Claims

Count II alleges that defendants breached the LLC's Operating Agreement by depriving Bakerman of the benefit of the LLC Operating Agreement's unanimous consent requirement, by failing to inform Bakerman's decision and by obtaining the consent through coercion and economic duress.

Count III alleges that defendants tortiously interfered with Bakerman's contractual relations, as established by the LLC's Operating Agreement. Specifically, defendants misallocated the purchase price, did not disclose the justification for the misallocation to Bakerman, did not disclose to Bakerman their conflicted interests, and deprived Bakerman of his contractual entitlement to give informed and volitional consent to the transaction through the use of coercion, threat of litigation, and economic duress.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

Count IV alleges that defendants breached the implied covenant of good faith and fair dealing by engaging in the actions that formed the bases of Counts II and III, and by additionally executing the Bacardi transaction, despite having knowledge of the deceptive and coercive nature of the consent obtained.

*C. Defendants' Contentions*

In respect to each claim, defendants move under Rule 12(b)(6) to dismiss for failure to state a claim. In more general attacks, defendants argue the following: First, the complaint is barred by the doctrine of laches, and the amended complaint is barred by Bakerman's unreasonable delay in amending the complaint until after Sidney Frank's death. Second, the individual and direct claims are in fact derivative in nature. Third, Bakerman's demand futility allegations fail to meet a heightened burden of pleading. Fourth, Bakerman is not an adequate derivative representative.

*D. Legal Standard*

**\*\*7** The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof." (FN4)

III. ANALYSIS

*A. Defendants' Rule 23.1 Motion: Was Demand on the Managers Excused?*

Bakerman seeks to assert multiple derivative claims on behalf of the LLC. Bakerman concedes that demand was not made on the LLC's current managers, Einsidler and Thompson. The Court must therefore determine whether demand is excused.

Court of Chancery Rule 23.1 imposes on a plaintiff prosecuting a derivative action a pleading burden that is "more onerous" than the burden a plaintiff must satisfy when confronted with a motion to dismiss under Court of Chancery Rule 12(b)(6). (FN5) Rule 23.1 requires a plaintiff to "allege with particularity ... the reasons ... for not making" a demand. (FN6) In considering a motion to dismiss under Rule 23.1, the Court must accept the well-pled allegations of the amended complaint as true. (FN7) Conclusory allegations, however, will not be accepted as true. (FN8)

Inquiry into whether demand is excused proceeds in this circumstance under the familiar test set forth by the Supreme Court in *Aronson v. Lewis*. (FN9) Under the two-pronged *Aronson* test, demand will be excused if the derivative complaint pleads particularized facts creating a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

otherwise the product of a valid exercise of business judgment." (FN10)

 Disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.... Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." (FN11)

1. *Were Einsidler and Thompson Interested Managers?*

 Bakerman alleges that demand is excused because Einsidler and Thompson are interested in the allocation due to their holdings in SFIC, because they are beholden to SFIC and Sidney Frank, and because there is reasonable doubt that the transaction was the product of a valid exercise of business judgment.

 Bakerman presents several particularized facts allegedly demonstrating Einsidler and Thompson's interest in misallocating the Bacardi proceeds to SFIC: (i) Einsidler and Thompson each owned a significant equity interest in SFIC; (ii) two other LLC members, Bakerman and Rodman, did not have any equity interest in SFIC and therefore did not stand to profit from any allocation to SFIC; (iii) wrongfully shifting proceeds to SFIC allowed defendants to avoid payment of French taxes, which would be owed on any proceeds distributed to SAS, and thereby reduce the overall profits to defendants; (v) and at a minimum, Einsidler and Thompson respectively received $70 million and $46 million from the Bacardi transaction. Alone, such benefits would clearly be significant enough "in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the shareholders without being influenced by her overriding personal interest." (FN12)

**8** Defendants argue that Einsidler and Thompson's large holdings in SFIC are rendered immaterial in light of their larger holdings in the LLC. The Amended Complaint notes that Einsidler and Thompson each possessed a 5% interest in the LLC. Their shares in SFIC appear smaller: dividing the portion of the proceeds Einsidler and Thompson received by the $2.24 billion allocated to SFIC reveals that Einsidler's and Thompson's interests in SFIC, as alleged by Bakerman, are at least 3.125% and 2.054%, respectively. For every dollar allocated to SFIC, it appears that Einsidler and Thompson received at least $0.03125 and $0.02054; for every dollar allocated to the LLC, Einsidler and Thompson received $0.05. Defendants argue that weighing Einsidler's and Thompson's interests demonstrates that their incentives were perfectly aligned with the LLC in respect to the allocation.

 In certain limited circumstances, this Court has declined to weigh interests on one side of the table against interests on the other side of the table when conducting an analysis of independence at the pleading stage. In *Siegman v. Tri-Star Pictures, Inc.,* then-Vice Chancellor Jacobs refused to analyze whether the holdings of certain Tri-Star Pictures directors in Coca-Cola were insignificant in view of their allegedly more substantial holdings in Tri-Star. (FN13) Because

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

the directors' Coca-Cola holdings resulted in their receipt of benefits from the challenged transaction not available to all Tri-Star stockholders, a reasonable doubt was created for demand excusal purposes. (FN14) In *Harbor Finance Partners v. Huzienga,* Vice Chancellor Strine similarly refused to weigh the holdings of a Republic director in Republic against his holdings in AutoNation, citing *Siegman.* (FN15) Both cases distinguish between the burden a plaintiff bears to plead reasonable doubt as to director disinterest under Rule 23.1 and its ultimate burden to demonstrate director interest later in the litigation through admissible evidence. (FN16)

At this stage, I decline to engage in a weighing analysis to determine the disinterestedness of Einsidler and Thompson for a number of reasons. Bakerman has pled a significant and material benefit that accrued to the LLC's managers through the allocation of consideration to SFIC at the expense of the LLC. Further, allocations to the LLC were subject to certain taxes; these taxes might have diminished the value of an allocation to the LLC, and Einsidler and Thompson's beneficiary 5% interests in such allocation. Finally, discovery might show that Einsidler and Thompson had SFIC holdings greater than 3.125% and 2.054%, as the Amended Complaint suggests. In other words, it is too early and the facts are not as clear as necessary to engage in such a weighing analysis. Bakerman has therefore met his burden at this stage in demonstrating the futility of demand.

2. *Were Einsidler and Thompson Independent of Sidney Frank?*

Turning to the independence facet of *Aronson'* s first prong, Bakerman alleges that Einsidler and Thompson were beholden to Sidney Frank. In the demand-futility context, to raise a question concerning the independence of a particular board member or LLC manager, a plaintiff "must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." ' (FN17) This lack of independence can be shown when a plaintiff pleads facts that establish "that the directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized." (FN18)

**\*\*9** Reasonable doubt surrounds the independence of the managers, raising a specter that their discretion was sterilized. The Amended Complaint alleges many particularized facts regarding the managers' independence, including: (i) SFIC and Sidney Frank were collectively controlling shareholders of the LLC, holding a 50% interest and 12.5% interest respectively; (ii) Sidney Frank controlled SFIC as founder, Chairman, CEO, and a 70% shareholder, and appointed and employed all of its directors and officers (including Einsidler and Thompson); (iii) SFIC was a party to and interested in the Bacardi transaction, and would receive all consideration allocated away from the LLC; (iv) Sidney Frank was interested in the transaction because he would receive $0.70 for every dollar allocated to SFIC, but only $0.50 for every dollar allocated to the LLC; and (v) as a result of the Bacardi transaction, Sidney Frank received approximately $1.6 billion.

These allegations create a reasonable doubt whether Einsidler and Thompson

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

could make judgments independent of the interests of Sidney Frank and SFIC. Delaware courts have found a lack of independence in similar circumstances. (FN19)

3. *Was the Challenged Decision the Product of a Valid Exercise of Business Judgment?*

Under *Aronson'* s second prong, demand is also excused if the complaint raises a reasonable doubt that the challenged decision was the product of a valid exercise of business judgment. (FN20) Absent particularized allegations to the contrary, the managers of an LLC are presumed to have acted on an informed basis and in the honest belief that the decisions were in furtherance of the best interests of the LLC and its members. (FN21) The burden is on the party challenging the decision to establish facts rebutting the presumption; (FN22) typically such showing of facts must be tantamount to corporate waste to satisfy the second prong of the demand futility analysis. (FN23) Courts focus on "the substance of the transaction and the process by which the board approved it." (FN24) Additionally, a court will consider factors such as whether the directors (i) informed themselves of material information; (ii) considered expert opinion; (iii) provided board members with adequate and timely notice of the transaction and its purpose before the board meeting; or (iv) adequately inquired into the reasons for or terms of the transaction. (FN25)

The Amended Complaint alleges particularized facts that the allocation was severely misallocated and that defendants did not employ the traditional processes (or any processes) that would have entitled them to the business judgment rule's protections. In respect to the process, Bakerman has pled particularized facts alleging that defendants failed to (i) obtain an independent expert appraisal to determine the value of SAS's assets, (ii) appoint a special committee to assess the fairness of the transaction or its terms, (iii) obtain sufficient information and data to assess the proposed allocation, (iv) bargain for the best possible result for the LLC, or (v) consider Bakerman's opinion that the allocation did not reflect the value of the LLC's assets. (FN26)

**10 In respect to the adequacy of the $11 million allocated in total to the LLC and SAS, Bakerman has pled facts including: (i) the total allocation to SAS was insufficient even to cover its liabilities; (ii) the $5.5 million allocated for an SAS production facility in France was less than the $7.5 million loan used to build it only two years earlier; (iii) the $200,000 allocated for SAS's international trademarks was less than even the legal costs incurred to obtain such marks; and (iv) SFIC was paid for the trademark and distribution rights in the international market that SAS in fact controlled. Receiving only 0.49% of $2.25 billion appears to be a questionable abdication by a non-wholly owned subsidiary to the will of SFIC that is quite dubious given its insufficiency to even cover its own liabilities. Furthermore, the high value of SAS's contractual rights to the recipes, formulas, and production processes until 2013 was verified by a later transaction. After Bacardi correctly expressed concern that Mounier could assert ownership of the residual rights to those assets, SFIC purchased Mounier's residual interest for $15 million. SAS was not compensated at all for

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

its contractual rights in the recipes, formulas, and production processes, but the residual interest in these rights alone was valued in an arms-length bargain at $15 million.  In light of these well-pleaded facts and accepting them as true as I must, the allocation of only $11 million to SAS appears so one sided that no business person of ordinary, sound judgment could reasonably conclude that it constituted adequate consideration.  (FN27) The allegations in the Amended Complaint thus create (additionally) a reasonable doubt as to whether approval of the Bacardi transaction was the product of a valid exercise of business judgment by the managers.  For this additional reason, I conclude that Bakerman has met his burden of demonstrating the futility of demand.

*B. Bakerman's Adequacy as Derivative Representative*

    Defendants next argue that plaintiff Bakerman is an inadequate derivative representative of the LLC because his position as SFIC's former chief legal counsel and his alleged violation of New York Disciplinary Rule 5-104(a) ("DR 5-104(a)") both impugn his integrity and void his interest in the LLC. Further, defendants insist Bakerman is not an adequate representative because the lawsuit is not supported by the other LLC members.  Bakerman responds that he satisfies all factors required of a derivative representative, that a determination of whether a violation of DR 5-104(a) occurred is both inapposite and improper in either this Court or at this stage of the pleadings, and that opposition to the lawsuit by other members is irrelevant in these circumstances.

    A plaintiff seeking to maintain derivative claims must satisfy the adequacy requirements implicit in Court of Chancery Rule 23.1.  (FN28) "[A] derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity."  (FN29) In a challenge to a particular plaintiff's adequacy, however, the burden rests with the defendant.  (FN30) "The defendant must show a substantial likelihood that the derivative action is not being maintained for the benefit of the shareholders."  (FN31)

    **11 A number of factors may be considered in determining whether a plaintiff is deemed "adequate" for these purposes:

    (1) economic antagonisms between the representative and the class;

    (2) the remedy sought by plaintiff in the derivative litigation;

    (3) indications that the named plaintiff was not the driving force behind the litigation;

    (4) plaintiff's unfamiliarity with the litigation;

    (5) other litigation pending between plaintiff and defendants;

    (6) the relative magnitude of plaintiff's personal interests as compared to her interest in the derivative action itself;

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

(7) plaintiff's vindictiveness toward defendants; and

(8) the degree of support plaintiff was receiving from the shareholders she purported to represent. (FN32)

This list, however, is not exhaustive. (FN33) "Typically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1." (FN34) It is possible that the inadequacy of a plaintiff may be demonstrated by a "strong showing of only one factor [; however,] that factor must involve some conflict of interest between the derivative plaintiff and the class." (FN35)

"The ethical considerations which bar an attorney from acting as counsel against his former client also preclude him from acting as a class or derivative plaintiff against his former client." (FN36) When a general counsel's former representation of his corporate employer involves issues that are "substantially related" to the claims he seeks to assert derivatively against his former client, he may be disqualified. (FN37)

To determine whether matters are "substantially related" for purposes of a conflict of interest with a former client the Court must evaluate: the nature and scope of the prior representation at issue; the nature and scope of the present lawsuit against the former client; and whether during the course of the previous representation the client may have disclosed confidential information that could be used against the former client in the current lawsuit. (FN38) Matters may be substantially related if they involve the same transaction or legal dispute or there is substantial risk that confidential information obtained in the former representation could materially advance the client's position in the current matter. The former client is not required to reveal specific details of the information shared with the attorney; rather, the Court may determine whether information regularly shared in that type of representation creates an unavoidable conflict with the current case. (FN39)

Specifically, Comment 3 to D.L.R.P.C. 1.9 provides that "[a] conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." Additionally, "[i]n the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." (FN40) These principles govern the Court's analysis of whether Bakerman's prior representation of SFIC as its chief legal counsel is substantially related to the matters at issue in the present litigation.

**12 Defendants' assertions fail to demonstrate that Bakerman's former representation of SFIC is substantially related to the current lawsuit. As alleged in the Amended Complaint, Bakerman was specifically excluded from the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

Bacardi negotiations, and never served as a legal advisor on the transaction. (FN41) Instead, Bakerman's knowledge of the Bacardi transaction was obtained in his capacity as a voting member of the LLC, and only at the eleventh hour. (FN42) Defendants must proffer evidence that Bakerman served as a legal advisor to SFIC in the Bacardi transaction or substantially related matters. This allegation is not substantiated by the facts as set forth in the Amended Complaint.

This case is different from two cases in which a former legal counsel was disqualified as a derivative lead plaintiff. In *Ercklentz v. Inverness Management Corp.*, this Court granted the defendants' motion to disqualify the plaintiff, who had formerly served as general counsel (and director) of the defendant corporation. (FN43) In granting the motion to disqualify the plaintiff, the Court found that as general counsel to the defendant corporation, plaintiff negotiated and drafted agreements for those transactions challenged by the lawsuit. (FN44) Such involvement and knowledge of specific facts gained as general counsel was highly relevant to the matter in question, where plaintiff alleged that a controlling shareholder had engaged in an ongoing manipulative scheme at the expense of the corporation and its shareholders. (FN45)

In *Khanna v. McMinn,* this Court granted the defendants' motion to disqualify Khanna as a derivative and class plaintiff. (FN46) Khanna served as general counsel to nominal defendant Covad during the relevant periods for all the transactions challenged. (FN47) According to his own testimony, Khanna "owned" corporate governance issues for Covad and had a role to play in such areas. (FN48) Following Khanna's termination from Covad, he threatened to bring a derivative and class action lawsuit against Covad unless he was rehired and promoted. (FN49) When his demands were not met, Khanna filed suit along with two other plaintiffs, and alleged breaches of fiduciary duty by certain directors for usurping corporate opportunities and enriching themselves at the company's expense through a series of transactions occurring over a period of at least three years. (FN50) In disqualifying Khanna, the Court relied on his prior position, his admitted involvement in the subject matter of the litigation, and "the cloud hanging over the litigation created by the tangential and acrimonious employment dispute between Khanna and his former employer." (FN51) Notably, two co-plaintiffs remained following Khanna's disqualification. (FN52)

Here, Bakerman is not challenging a series of transactions in which he was a key participant, but rather is challenging the allocation in a single transaction from whose negotiations he was actively excluded. Additionally, Bakerman had a role as an LLC member in approving the transactions, distinct from his role as SFIC counsel. Finally, unlike *Khanna,* no co-plaintiffs remain to prosecute this action in the event of Bakerman's disqualification. (FN53)

**13 Defendants also argue that 95% of the ownership interests of the LLC do not support this lawsuit. A derivative claim may be maintained, however, without the support of a majority of ownership or even the support of the entire minority. Adequacy of representation is judged by how well a shareholder advances the interests of other similarly situated shareholders. (FN54) If it

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

turns out that Bakerman is the only member disadvantaged by the lower allocation to the LLC, then one could not imagine a better representative than himself to pursue the appropriate remedies on behalf of the LLC. For these reasons, defendants' motion to disqualify Bakerman as a derivative representative is denied.

## C. Bakerman's Derivative Claim for Breach of Fiduciary Duty

Bakerman alleges a breach of fiduciary duty claim against defendants on three separate grounds: (i) their artificial suppression of the transfer pricing in the vodka sales from SAS to SFIC before the Bacardi sale; (FN55) (ii) their misallocation of the purchase price paid by Bacardi; (FN56) and (iii) failing to disclose their conflicts of interest related to the allocation. (FN57) Defendants respond to the first claim thusly: as a knowledgeable member of the LLC and lead counsel to SFIC, Bakerman was aware of the transfer pricing for a period of two years. Because he remained silent despite numerous opportunities to raise the issue, Bakerman acquiesced to the transfer pricing. In response to the second claim, defendants argue simply that Bakerman signed his consent to the transaction as a member of the LLC. Bakerman replies that his alleged consent was the product of coercion. In response to the third claim, defendants argue that as Chief Legal Counsel to SFIC, Bakerman was aware of Einsidler and Thompson's holdings of SFIC shares and options, making disclosure of their conflict of interest unnecessary.

### 1. Did Bakerman Consent to the Bacardi Transaction?

The parties dispute what standard is relevant to determining whether or not Bakerman's consent was coerced. The term "coercion" itself--covering a multitude of situations--is not very meaningful. (FN58) For the word to have much meaning for purposes of legal analysis, it is necessary in each case that a normative judgment be attached to the concept. (FN59) Bakerman argues that because his consent effectively ratified the managers' actions, its integrity should be protected in the same manner as a shareholder vote ratifying a board action. (FN60) Roughly, if some other party causes stockholders to vote in favor of a proposed transaction for some reason other than the merits of that transaction, then the vote has been inequitably coerced. (FN61) Defendants argue that this doctrine of inequitable coercion is inapposite to the bilateral negotiation that took place between Bakerman and Einsidler. They point to a line of contract cases where the standards for proving coercion are much more difficult to meet.

### a. The Inequitable Coercion Doctrine is Inapplicable

**14** I agree with defendants that the inequitable coercion doctrine is inapplicable here, as it has been developed solely in cases dealing with diffuse shareholders. For example, in *Lacos Land Co. v. Arden Group, Inc.*, then-Chancellor Allen evaluated the integrity of a shareholder vote authorizing a proposed recapitalization. (FN62) The result of the recapitalization would have been to grant control of the corporation to the then-CEO, by effectively increasing the CEO's voting power from approximately 20% to 67% through the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

issuance of supervoting stock.  In disclosures, shareholders were unmistakably told that unless they approved the recapitalization, the CEO would oppose transactions "which could be determined by the Board of Directors to be in the best interests of all of the stockholders."  (FN63) The Chancellor found such a threat to undermine the structure of the shareholder vote to the point that it no longer satisfied the mandate of 8 *Del. C.* § 242(b) requiring shareholder consent to charter amendments.  (FN64) Similarly, in *Eisenberg v. Chicago Milwaukee Corp.,* then-Vice Chancellor Jacobs found that a self-tender was inequitably coercive when a proxy statement seeking shareholder approval disclosed plans to delist the company's preferred stock, the board adopted a "no-dividend" policy, and timed the tender offer with a four-year low market price for the preferred stock.  (FN65)

These cases in which the doctrine has developed are premised on the proposition that "proxy voting has become the dominant mode of shareholder decision making in publicly held corporations."  (FN66) This premise does not apply to a member of a closely held LLC. Unlike diffuse shareholders, Bakerman was not inhibited by the costs of collective action.  He sat across the table from Einsidler on two occasions in the span of half an hour.  The inequitable coercion doctrine is simply unhelpful, analytically, for adjudicating such negotiations and arguments. Instead, there is a well-developed body of law meant to govern negotiations between parties, which I will use to address Bakerman's coercion allegations. Before proceeding to that analysis, however, it is worth examining a certain aspect in which the negotiations here differ from an arm's length bargain reached across a negotiating table.

b. Thompson and Einsidler Owed Bakerman a Duty to Disclose all Material Facts Bearing on the Decision at Issue

Einsidler was a manager of the LLC owing certain duties to members of the LLC such as Bakerman.  When fiduciaries communicate with their beneficiaries in the context of asking the beneficiary to make a discretionary decision--such as whether to consent to a sale of substantially all the assets of an LLC--the fiduciary has a duty to disclose all material facts bearing on the decision at issue.  (FN67) "An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote.  To prevail on a claim of material omission, therefore, a plaintiff must demonstrate a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder.  There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the 'total mix' of information made available."  (FN68)

**15 If Bakerman was unaware of Einsidler and Thompson's large holdings in SFIC, then Einsidler and Thompson owed Bakerman a duty to disclose such conflict of interest when they were urging him to consent to the allocation.  Such conflict of interest clearly would have altered Bakerman's perception of Einsidler and Thompson's counsel that the allocation was indeed fair.  Defendants

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

argue that Bakerman nowhere alleges that he was unfamiliar with the managers' relative interests in SFIC, for whom he was Chief Legal Counsel, and in the LLC, which he asserts he created.  By virtue of his position within SFIC, Bakerman would have, or should have, known the actual amounts that the managers stood to gain from the Bacardi transaction.  Drawing all reasonable inferences in favor of Bakerman, however, the Amended Complaint avers that he was unaware of the managers' holdings in SFIC.  Possibly he was not involved in establishing the Warrant Plan because he was not a participant, and Sidney Frank delegated the details to someone who would not be as disappointed at being excluded from the plan as Bakerman likely was.  Discovery should uncover what Bakerman knew of the Warrant Plan and Einsidler and Thompson's holdings in SFIC, at the time he signed the consent to the transaction.  Therefore, I will not at this stage dismiss Bakerman's claim of a breach of fiduciary duty for failure to disclose the managers' conflicts of interest.

A material omission in the context of asking Bakerman to consent to a sale of substantially all the assets of the LLC could vitiate his consent, thereby ending the analysis of the effect of his consent.  Nonetheless, appreciating that Bakerman's supposed ignorance of the managers' interests might be a reasonable inference that is simultaneously improbable, I proceed to examine whether or not Bakerman was wrongfully coerced to give his consent.  This examination will be subject, as defendants urge, to the well-developed set of standards governing products of bilateral contract negotiations.

c. Was Bakerman Coerced?

A party alleging actionable coercion or duress must plead (i) a wrongful act; (ii) which overcomes the will of the aggrieved party; and (iii) that he has no adequate legal remedy to protect himself.  (FN69) The "wrongful act" is often the use of or threat to inflict immediate physical harm.  This state, like many others, has broadened this element to include a wider range of wrongful acts, including economic duress.  (FN70) Nevertheless, under the second element, the wrongful act "must be of such a nature as to actually over-ride the judgment and will of the other party...." (FN71) "The test for determining whether the duress produced the assent is a subjective one that focuses on the state of mind of the 'victim' of the duress." (FN72) The third prong focuses on whether the coercive conduct creates or takes advantage of an exigent circumstance such that the victim could not reasonably be expected to resist and seek legal relief to protect his interests.  (FN73)

i. Was There a Wrongful Act?

**16** Bakerman does not allege a threat of physical harm, but alleges two forms of economic duress: a threat to file a lawsuit against Bakerman and a threat to terminate his employment.

Threats of litigation constitute "wrongful acts" for purposes of a claim of coercion or duress, if such threats were made without a good faith belief that a viable cause of action existed.  (FN74) Defendants offer one justification for

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

the threat to litigate: Bakerman's purported violation of DR 5-104(a) four years earlier (by accepting a 5% membership in Grey Goose LLC) justified their threatened law suit against him if he were to exercise his rights as a member and refuse to consent. Whether that threat was made in good faith raises factual issues that may not be resolved at this juncture. The Amended Complaint alleges facts that would provide no good faith basis to threaten a lawsuit: (i) Bakerman acquired his interest in the LLC on fair and reasonable terms, which were identical to the terms on which defendants acquired their own interests in the LLC; (FN75) (ii) those terms were fully disclosed in writing to SFIC in a manner that could be reasonably understood by SFIC; (FN76) and (iii) the potential conflict of interest was disclosed to SFIC. (FN77) Furthermore, it is unclear whether such a violation, without more, would support rescission of his interest in the LLC even if Bakerman had violated DR 5-104(a). (FN78) Finally, the timing of such threat--nearly four years after the alleged violation of DR 5-104(a)-- only lends itself to the explanation that the threat was a bad faith attempt to elicit Bakerman's consent to the allocation of the purchase price. These allegations, when assumed to be true and viewed in the light most favorable to Bakerman, support a reasonable inference that defendants committed a wrongful act through a bad faith threat of litigation. (FN79)

Bakerman additionally contends that defendants' threat to terminate his employment constituted a wrongful act. Although Delaware possibly recognizes a covenant of good faith and fair dealing in at-will employment, (FN80) New York does not. (FN81) In New York, however, an employer's threat to terminate an at-will employee in order to obtain a release of claims is subjected to a standard apparently more stringent than ordinary contract principles. (FN82) Seven factors are considered: 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented or consulted with an attorney, 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law, and 7) whether an employer encourages or discourages an employee to consult an attorney. (FN83) As Einsidler and the lawyers argued that Bakerman's consent to the transaction was unnecessary in light of his conflict of interest, continued pursuit of Bakerman's consent was effectively an attempt to secure a release of claims that arose in the context of both Bakerman's holdings in the LLC and his employment for the SFIC.

**17 Under New York law, Einsidler's threat to terminate Bakerman in order to obtain his consent arguably constituted a wrongful act. Several factors raise sufficient question as to the voluntariness of the consent in the context of the threat to employment: Bakerman was only given a half hour to examine the consent and purchase agreement, (FN84) he was given no role in crafting the consent, he was arguably entitled to the $700,000 even without signing the consent, and he was not represented by nor encouraged to consult counsel. (FN85)

At this stage, the threat of litigation and termination of employment have been sufficiently pled to satisfy the wrongful act element of a claim of economic

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

duress.

### ii. Was Bakerman's Will Over-Ridden?

As stated earlier, the second element of a claim of economic duress requires that the wrongful act "must be of such a nature as to actually override the judgment and will of the other party...." (FN86) "The test for determining whether the duress produced the assent is a subjective one that focuses on the state of mind of the 'victim' of the duress." (FN87) Defendants secretly negotiated with Bacardi for months and waited to seek Bakerman's consent to the transaction until shortly before the public announcement of the sale. (FN88) After finally revealing the transaction and a draft of its proposed terms to Bakerman, defendants did not provide any substantive information to support the allocation. Before discovery into the events surrounding the eleventh hour ultimatum, and at this stage where all reasonable inferences must be made in favor of plaintiff, it is reasonable to believe that Bakerman's will was overcome.

### iii. Did Bakerman Have Adequate Legal Remedy to Protect Himself?

The final element of economic duress focuses on whether the coercive conduct creates or takes advantage of an exigent circumstance such that the victim could not reasonably be expected to resist and seek legal relief to protect his interests. Of particular note, therefore, is the manner in which the consent was requested, and the short time Bakerman was given to decide. Viewed in the light most favorable to Bakerman, Einsidler laid out a trap for Bakerman. The allocation was hidden from Bakerman until the eleventh hour, (FN89) he received an ultimatum threatening a lawsuit and employment termination, and he was given only 30 minutes to decide. Further, he was not permitted to speak with Sidney Frank; nor was he given adequate time or privacy to confer with counsel. Viewing the facts as pled in the light most favorable to Bakerman, his consent was coerced and does not preclude a claim for breach of the duty of loyalty. (FN90)

### 2. *Did Bakerman Acquiesce?*

In addition to alleging that Bakerman's consent to the Bacardi transaction bars his claims, defendants additionally argue that Bakerman's acceptance of pecuniary benefits flowing from the transaction bars his claims under the doctrines of ratification and acquiescence. "Acquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." (FN91) Similarly, "[r]atification results if the party who executed the contract under duress accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or void it." (FN92)

### a. In Respect to the Transfer Pricing?

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

**\*\*18** It is unclear whether defendants properly challenged Bakerman's breach of fiduciary duty claim alleging defendants' artificial suppression of the transfer pricing in the vodka sales from SAS to SFIC during the years before the Bacardi transaction. (FN93) Regardless, drawing all reasonable inferences from the allegations in the Amended Complaint in favor of plaintiff, Bakerman was unaware of the transfer pricing and therefore did not acquiesce or ratify it.

According to the Amended Complaint, in 2003 SAS sold more than 2.3 million cases of Grey Goose Vodka, the majority of which was to SFIC at an unreasonably steep discount (the transfer price). Bakerman was terminated in August 2004. Although Bakerman's ignorance is not specifically pled, it is an inference that will be granted for the time being, keeping in mind that further discovery should quickly resolve what exactly Bakerman knew about the transfer pricing.

b. In Respect to the Allocation?

Defendants assert that Bakerman acquiesced in or ratified the purchase price allocation by accepting an employee bonus following the Bacardi sale and by waiting eighteen months to bring this lawsuit. Drawing all reasonable inferences in favor of plaintiff, however, Bakerman did not acquiesce in or ratify the purchase price allocation. Bakerman, like all SFIC employees, received a substantial employee bonus following the Bacardi sale. That bonus resulted from his SFIC employment and was unrelated to the purchase price allocation or his membership interest in the LLC. (FN94) Bakerman has never received any distributions or other monetary payments for his membership interest.

Bakerman has not acquiesced in the purchase price allocation by inaction. Traditionally, the doctrine of acquiescence has included an additional showing that the plaintiff, by words or deeds, has acknowledged the legitimacy of the defendant's conduct. (FN95) An essential element of acquiescence is "that the acquiescing party shows unequivocal approval of the transaction." (FN96) Here, Bakerman did not show unequivocal approval of the allocation, as he vigorously objected to the allocation, even as he was allegedly coerced into consenting. Moreover, he repeatedly refused to sign a comprehensive release shortly after the transaction. (FN97)

*D. Unjust Enrichment*

Bakerman broadly alleges that as a result of defendants' wrongful and unjustified conduct, they have been unjustly enriched at the LLC's expense. Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience." (FN98) The elements of unjust enrichment are (i) an enrichment, (ii) an impoverishment, (iii) a relation between the enrichment and impoverishment, (iv) the absence of justification, and (v) the absence of a remedy provided by law. (FN99) Courts developed unjust enrichment as a theory of recovery to remedy the absence of a formal contract. (FN100) Therefore, claims of unjust enrichment may survive a motion to dismiss when the validity of the contract is in doubt or uncertain. (FN101) When the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

complaint alleges an express, enforceable contract that controls the parties' relationship, however, a claim for unjust enrichment will be dismissed.  (FN102) This is the case even when the enforceable contract gives rise to a fiduciary relationship between the parties.  (FN103)

**\*\*19** Here, the relationship between the LLC and the defendants was expressly governed by the LLC's Operating Agreement and the fiduciary duties that arose from such an agreement.  Bakerman argues unavailingly that the LLC's rights to the allocation are governed by the APA.  Count I (defendants' breach of fiduciary duty) and Count II (defendants' breach of contract), however, allege both a contract (the Operating Agreement) and fiduciary duties that governed both the substance of the allocation and the manner in which it was approved.  Therefore, Bakerman's claim of unjust enrichment is dismissed.

*E. Tooley Analysis*

Defendants argue that Bakerman's individual causes of action are derivative in nature.  The distinction between derivative and direct claims has only academic import at this stage because demand is presently excused and because Bakerman remains a member of the LLC (FN104) and an adequate representative of the class.  Nonetheless, acknowledging that this issue may arise again after discovery and that defendants have pressed it on this motion, I turn to it briefly.

Whether a claim is derivative or direct depends solely upon two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders individually); and (2) who would receive the benefit of the recovery or other remedy (the corporation or the stockholders, individually)?"  (FN105) In applying this test, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint.  (FN106)

Bakerman's contract and good faith and fair dealing claims are direct claims because they allege that defendants deprived Bakerman of his voting rights under the LLC's Operating Agreement, and because Bakerman would receive the benefit of any recovery.  The deprivation of Bakerman's right to freely consent to the transaction is a harm unique to Bakerman that allegedly benefited certain controlling members of the LLC. (FN107) Consequently, Bakerman would be the eventual sole recipient of the remedy.  For these reasons, Counts II and IV will be treated as direct claims.

*F. Breach of Contract*

Bakerman has pled a claim for breach of contract.  Under the notice pleading standard, (FN108) he need only allege the existence of a contract, the breach of an obligation imposed by that contract, and the resultant damage.  (FN109) Bakerman has satisfied the notice pleading burden by alleging that: (i) the Operating Agreement is a contract between the managers and members of the LLC, including Bakerman and defendants; (FN110) (ii) defendants breached the Operating Agreement by obtaining Bakerman's consent through economic duress; (FN111) and (iii) Bakerman suffered substantial damages as a result.  (FN112)

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

*G. Breach of the Implied Covenant of Good Faith and Fair Dealing*

   Bakerman has adequately stated a claim for breach of the implied covenant of good faith and fair dealing.  In Delaware, an implied covenant of good faith and fair dealing inheres in every contract.  (FN113) The implied covenant is a "judicial convention designed to protect the spirit of the agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." (FN114) Courts will find a breach of an implied covenant when it is "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith had they thought to negotiate with respect to that matter."  (FN115)

   **20 "[I]n order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendants, and resulting damage to the plaintiff."  (FN116) Bakerman claims that the implied contractual obligation arises from the Operating Agreement's requirement that members of the LLC unanimously approve certain fundamental transactions.  Bakerman alleges that defendants have violated the implied contractual obligation by: (i) misallocating the transaction proceeds to serve their own self interests at Bakerman's expense; (ii) failing to disclose material information necessary to allow Bakerman to make an informed decision regarding the consent; (iii) depriving Bakerman of his right to give volitional consent to the transaction without coercion and duress; and (iv) executing the Bacardi transaction with knowledge of the coercive nature of the consent.  These allegations are largely duplicative of earlier allegations of breaches of the duty of loyalty, the so-called duty of disclosure, and the Operating Agreement.  Nonetheless, Bakerman may, after discovery, be able to show some independent breach of the duty of good faith and fair dealing that falls outside the ambit of these previously pled breaches.  (FN117) For that reason, I decline at this stage of the matter to dismiss Count IV of the Amended Complaint.

*H. Laches*

   The Amended Complaint is not barred by laches.  A claim is barred by the doctrine of laches if the plaintiff, having learned of his claim, unreasonably delayed in asserting his rights and the defendants were prejudiced by the plaintiffs' failure to assert their claim in a timely manner.  (FN118) Bakerman likely became aware of his legal options in the months following June 2004, and filed this lawsuit in December 2005.  Following the filing of defendants' first motion to dismiss that attacked Bakerman's alleged conflict of interest, Bakerman filed the Amended Complaint that described communications with Sidney Frank and Lee Einsidler about such conflict.  In the meantime, defendant Sidney Frank died in early January 2006, after the original complaint had been filed, but months before the filing of the Amended Complaint.

   According to defendants, the delay in filing the original complaint has deprived them of a crucial witness regarding the communications alleged in the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

Page 23

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

Amended Complaint.  Defendants misconstrue the Amended Complaint--Bakerman does not allege a one-on-one conversation with Sidney Frank, but discussions that involved both Sidney Frank and Lee Einsidler.  Further, the less than eighteen-month delay was a reasonable delay necessary to ascertain the merits of Bakerman's claims and to retain counsel paid on a contingency basis.  Finally, nothing suggests that Bakerman waited on the sidelines for Sidney Frank's death-- Bakerman filed the original complaint in December 2005, nearly a month before Sidney Frank passed away.  Bakerman amended the original complaint in order to respond to specific arguments raised by defendants in their first motion to dismiss.  For these reasons, I conclude that the Amended Complaint is not barred by laches.

*I. Tortious Interference*

   **\*\*21** Bakerman cannot state a claim for tortious interference because the defendants are parties to the contract with which they allegedly interfered. (FN119) SFIC, Bruno, Sidney Frank, Einsidler, John Frank, Thompson, and Moselman, as members of the LLC, were parties to the Operating Agreement.  They cannot be liable for tortiously interfering with their own agreement.  Therefore, Count III must be dismissed.

                          IV.  CONCLUSION

   Bakerman's claims for unjust enrichment (Count V) and tortious interference (Count III) are hereby dismissed.  For the reasons set forth above, however, I deny defendants' motion to dismiss Bakerman's remaining claims.  Counsel shall confer and submit a form of order implementing this decision.  Counsel shall further confer and agree upon a scheduling order to move this case forward in an expeditious fashion.

   (FN1.) *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del.2006) (on a motion to dismiss, trial court may properly take judicial notice of matters that are not subject to reasonable dispute).

   (FN2.) Linda Rodman is the daughter of the late Eugene Frank, and the sister of John Frank.  Rodman acquired her 3.75% interest in the LLC from her father's estate.  She never held an equity interest in SFIC, however.  Am. Compl.  ¶¶ 77-78.

   (FN3.) Ct. Ch. R. 15(a).

   (FN4.) *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-7 (Del.2002)).

   (FN5.) Ct. Ch. R. 23.1; *Levine v. Smith*, 591 A.2d 194, 207 (Del.1991), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244, 254 (Del.2000).

   (FN6.) Ct. Ch. R. 23.1.

           © 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

(FN7.) *Grobow v. Perot,* 539 A.2d 180, 186 (Del.1988).

(FN8.) *Id.* at 187; *see also Rales v. Blasband,* 634 A.2d 927, 931 (Del.1993).

(FN9.) 473 A.2d 805 (Del.1984).

(FN10.) *Id.* at 814-15.

(FN11.) *In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *8 (Del. Ch. Apr. 29, 2005) (quoting *Aronson,* 473 A.2d at 812, 816), *aff'd,* 2006 WL 585606 (Del. Mar. 8, 2006); *see also Rales,* 634 A.2d at 936.

(FN12.) *Orman v. Cullman,* 794 A.2d 5, 23 (footnotes omitted).

(FN13.) 1989 WL 48746, at *11 (Del. Ch. May 5, 1989), *rev'd on other grounds,* 634 A.2d 319 (Del.1989).

(FN14.) *Id.*

(FN15.) *Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 888 (Del. Ch.1999).

(FN16.) *Siegman,* 1989 WL 48746, at *10; *Huzienga,* 751 A.2d at 888. Vice Chancellor Strine noted that while the Court would not compare shareholdings but would look to the materiality of the director's holdings in the corporation across the table, a weighing analysis could be relevant in situations where directors address a transaction that has different effects on two classes of the corporation's own stock. *Id.* at 888 n. 28.

In those situations, the directors often own both classes of stock because corporations want to align the directors' interests with those of all the company's stockholders. Our case law has long recognized that necessity requires directorial action in these circumstances and that such ownership interests do not necessarily strip directors of their disinterested status.

*Id.* (quoting *Gilbert v. El Paso Co.,* 575 A.2d 1131, 1147-48 (Del.1990)); *see also Solomon v. Armstrong,* 747 A.2d 1098, 1117-18, 1124 (Del. Ch.1999); *Jedwab v. MGM Grand Hotels, Inc.,* 509 A.2d 584, 595 (Del. Ch.1986) (weighing controlling shareholder's interests in preferred and common stock of corporation to conclude that based on shareholdings alone, he did not have a self-interest to favor common over preferred); *Freedman v. Rest. Assocs. Indus.,* 1987 WL 14323, at *10 (Del. Ch. Oct. 16, 1987).

**21    (FN17.) *Aronson,* 473 A.2d at 816 (citation omitted).

(FN18.) *Rales,* 634 A.2d at 936; *see also Friedman v. Beningson,* 1995 WL 716762, at *9 (Del. Ch. Dec. 4, 1995) ("The requirement that directors exercise independent judgment, (insofar as it is a distinct prerequisite to business judgment review from a requirement that directors exercise financially disinterested judgment), directs a court to an inquiry into all of the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

circumstances that are alleged to have inappropriately affected the exercise of board power.  This inquiry may include the subject whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation.").

(FN19.) *Beam v. Stewart,* 833 A.2d 961, 978 (Del. Ch.2003) (finding executive employee of one of Martha Stewart's companies beholden to Stewart); *California Pub. Employees' Ret.  Sys. v. Coulter,* 2002 WL 31888343, at *9-10 (Del. Ch. Dec. 18, 2002) (explaining that interested director was superior of one non-interested director and owned company that employed another non-interested director's son); *In re The Limited,* 2002 WL 537692, at *5 (Del. Ch. Mar. 27, 2002) (noting that compensation from one's principal employment is typically of great consequence to the employee); *Rales,* 634 A.2d at 937 (finding no independence where non-interested directors employed by and could be removed by Rales brothers); *Kahn v. Tremont Corp.,* 1994 WL 162613, at *2 (Del. Ch. Apr. 21, 1994) (finding demand futility where complaint specifically alleged that controlling shareholder employed a majority of the directors at various of his entities).

(FN20.) *Aronson,* 473 A.2d at 812.

(FN21.) *See Highland Legacy Ltd. v. Singer,* 2006 WL 741939, at *7 (Del. Ch. Mar. 7, 2006) (elucidating a similar presumption in respect to directors of a corporation).

(FN22.) *Aronson,* 473 A.2d at 812.

(FN23.) *See Tremont Corp.,* 1994 WL 162613, at *6 ("The test for this second stage is thus necessarily high, similar to the legal test for waste.").

(FN24.) *Caruana v. Saligman,* 1990 WL 212304, at *4 (Del. Ch. Dec. 21, 1990).

(FN25.) *Ash v. McCall,* 2000 WL 1370341, at *10 (Del. Ch. Sept. 15, 2000).

(FN26.) Am. Compl., ¶  ¶ 103-104.

(FN27.) *Brehm,* 746 A.2d at 263.

(FN28.) *See, e.g., Youngman v. Tahmoush,* 457 A.2d 376, 379 (Del. Ch.1983).  The analysis of Bakerman's capacity to serve as a derivative plaintiff will, in this instance, be the same as the analysis of the propriety of his service as class representative.  *See, e.g., In re Fuqua Indus. S'holder Litig.,* 752 A.2d 126, 129 n. 2 (Del. Ch.1999) ("[A]nalysis of adequacy requirements is generally the same under Rules 23 and 23.1 as cases decided under Rule 23(a)(4), *i.e.,* the adequacy requirement of Rule 23, may be used in analyzing the adequacy requirements of Rule 23.1."  (citations omitted)).

(FN29.) *In re Fuqua Indus.,* 752 A.2d at 129 (citing *Katz v. Plant Indus., Inc.,*

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

1981 WL 15148, at *1 (Del. Ch. Oct. 27, 1981)).

(FN30.) *See Emerald Partners v. Berlin*, 564 A.2d 670, 674 (Del. Ch.1989).

(FN31.) *Id.; see also Canadian Commercial Workers Indus. Pension Plan*, 2006 WL 456786, at *8.

**\*\*21** (FN32.) *In re Fuqua Indus.*, 752 A.2d at 130.

(FN33.) *See Katz*, 1981 WL 15148, at *2 (explaining that the factors are "[a]mong the elements which the courts have evaluated").

(FN34.) *Id.*, at *2 (quoting *Davis v. Comed, Inc.*, 619 F.2d 588, 593-94 (6th Cir.1980)); *see also In re Fuqua Indus.*, 752 A .2d at 130 n. 5.

(FN35.) *In re Fuqua Indus.*, 752 A.2d at 130; *see also Canadian Commercial*, 2006 WL 456786, at *8 (explaining that "economic" conflicts are often the primary consideration); *Youngman*, 457 A.2d at 379 (noting exception that "fact that the plaintiff may have interests which go beyond the interests of the class, but are at least co-extensives with the class interest, will not defeat his serving as a representative of the class"). The Court in Youngman also explained that "purely hypothetical, potential or remote conflicts of interests never disable the individual plaintiff." *Id.* (citation omitted).

(FN36.) *Ercklentz v. Inverness Mgmt. Corp.*, 1984 WL 8251, at *4 (Del. Ch. Oct. 18, 1984) (citing *Richardson v. Hamilton Int'l Corp .*, 469 F.2d 1382 (3d Cir.1972); *Doe v. A Corp.*, 709 F.2d 1043 (5th Cir.1983)).

(FN37.) *See Ercklentz*, 1984 WL 8251, at *4-5; *see also* Delaware Lawyers' Rules of Professional Conduct ("D.L.R.P.C.") 1.6, 1.9. *Cf. Richardson*, 469 F.2d 1382; *Doe v. A Corp.*, 330 F.Supp. 1352 (S.D.N.Y.1971), *aff'd sub nom., Hall v. A Corp.*, 453 F.2d 1375 (2d Cir.1972).

(FN38.) *Khanna v. McMinn*, 2006 WL 1388744, at *42 (Del. Ch. May 9, 2006).

(FN39.) *Hendry v. Hendry*, 2005 WL 3359078, at *4 (Del. Ch. Dec. 1, 2005) (citing *Sanchez-Caza v. Estate of Whetstone*, 2004 WL 2087922, at *3 (Del.Super.Sept. 16, 2004)); D.L.R.P.C. 1.9 cmt. 3.

(FN40.) D.L.R.P.C. 1.9 cmt. 3.

(FN41.) Am. Compl., ¶ ¶ 67-68.

(FN42.) Bakerman learned of a contemplated third/third/third split of the consideration among the different entities, a piece of knowledge possibly relevant to the LLC and its members. It is unclear in what capacity he received this hallway tidbit of information--whether as counsel to SFIC or member of the LLC. Because defendants bear the burden of proof, and because a reasonable interpretation of Bakerman's hallway inquiry is that he was

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

receiving such confidences as a member of the LLC, the hallway conversation will not disqualify Bakerman.

(FN43.) 1984 WL 8251 (Del. Ch. Oct. 18, 1984).

(FN44.) *Id.* at 5-6 (defendant director and shareholder "undoubtedly provided confidential information and received counsel from plaintiff as part of plaintiff's role as general counsel").

(FN45.) *Id.* at 2.

(FN46.) 2006 WL 1388744 (Del. Ch. May 9, 2006).

(FN47.) *Id.* at 42.

(FN48.) *Id.*

(FN49.) *Id.* at 43-44.

(FN50.) *Id.* at 5-10.

(FN51.) *Id.* at 44.

(FN52.) *Id.*

**21   (FN53.) This is a reasonable inference given Linda Rodman's connection to the Frank family, and her lack of involvement in this litigation to date.  See n. 2, *supra.*, p. 8.

(FN54.) *See Emerald Partners,* 564 A.2d at 674.

(FN55.) Am. Compl., ¶  ¶ 62-63, 115.

(FN56.) *Id.* at ¶  ¶ 70-79, 115.

(FN57.) *Id.*

(FN58.) *Katz v. Oak Indus. Inc.,* 508 A.2d 873 (Del. Ch.1986) ("A commonly used word--seemingly specific and concrete when used in everyday speech--may mask troubling ambiguities that upon close examination are seen to derive not simply from casual use but from more fundamental epistemological problems.  Few words more perfectly illustrate the deceptive dependability of language than the term 'coercion." ')

(FN59.) *Lacos Land Co. v. Arden Group, Inc.,* 517 A.2d 271 (Del. Ch.1986).

(FN60.) *See Williams v. Geier,* 671 A.2d 1368, 1382 (Del.1996).

(FN61.) *See, e.g., Eisenberg v. Chicago Milwaukee Corp.,* 537 A.2d 1051, 1061

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

(Del. Ch.1987) (holding corporation's self tender to be impermissibly coercive); *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 112-15 (Del. Ch.1986) (same).

(FN62.) 517 A.2d 271.

(FN63.) *Id.* at 278.

(FN64.) *Id.* at 279.

(FN65.) 537 A.2d 1051, 1061-1062 (Del. Ch.1987).

(FN66.) *Stroud v. Grace,* 606 A.2d 75, 86 (Del.1992).

(FN67.) *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 137 (Del.1997) ("Delaware law of the fiduciary duties of directors ... establishes a general duty of directors to disclose to stockholders all material information reasonably available when seeking stockholder action.")

(FN68.) *Id.* at 143.

(FN69.) *Cianci v. JEM Enter., Inc.,* 2000 WL 1234647, at *9 (Del. Ch. Aug. 22, 2000).

(FN70.) *See, e.g., Fowler v. Mumford,* 102 A.2d 535 (Del.Super.1954) (recognizing "economic duress" as a basis to find coercion in the procurement of a contract); *Hanna Sys., Inc. v. Capano Group, L.P.,* C.A. No. 7408, slip op. (Del. Ch. Nov. 29, 1985) (same); *E.I. DuPont de Nemours and Co. v. Custom Blending Int'l, Inc.,* C.A. No. 16295, slip op. (Del. Ch. Nov. 24, 1998) (same).

(FN71.) *Fluharty v. Fluharty,* 193 A. 838, 840 (Del.Super.1937).

(FN72.) *Hanna Sys., Inc. v. Capano Group, L.P.,* C.A. No. 7408, mem. op. at 7 (Del. Ch. Nov. 29, 1985) (citing Restatement (Second) of Contracts § 175, cmt. c. (1981)).

(FN73.) This prong is an outgrowth of the principle that the victim must have no reasonable alternative to accepting the bargain. *See* Restatement (Second) of Contracts, § 175(a) (1981).

(FN74.) *See Weber v. Kirchner,* 2003 WL 23190392, at *2 (Del. Ch. Dec. 31, 2003); *Edge of the Woods v. Wilmington Savs. Fund Soc'y, FSB,* 2001 WL 946521, at *5 (Del.Super.Aug. 16, 2001); *Way Road Dev. Co. v. Snavely,* C.A. No. 89C-DE-48, mem. op. at 9 (Del.Super. Jan. 31, 1992) ("As a general rule, a threat to enforce a legal right or to take legal measures by the filing of a civil lawsuit, cannot constitute duress so long as the party threatening filing the lawsuit did so in a good faith belief that a viable cause of action existed.").

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

**\*\*21**  (FN75.) Am. Compl., ¶  ¶ 38-40.

 (FN76.) *Id.* at ¶  ¶ 41-42.

 (FN77.) *Id.* at ¶ 42.

 (FN78.) *See, e.g., Schafrann v. N.V. Famka, Inc.,* 787 N.Y.S.2d 315, 316
 (N.Y.App.Div.2005) (dismissing client's malpractice claim where attorney
 accepted 10% partnership interest in violation of DR 5-104(a), but had
 otherwise disclosed conflict to client and client had consulted a disinterested
 third party).  As *Schafrann* explained, "defendant's malpractice claim rests
 solely on an alleged violation of the Disciplinary Rules which, without more,
 does not support a malpractice claim."  *Id. But see Schlanger v. Flaton,* 631
 N.Y.S.2d 293 (N.Y.App.Div.1995) (affirming rescission of attorney's interest in
 client's four corporations where attorney obtained such interests in violation
 of DR 5-104(a)).

 (FN79.) Defendants point out that Bakerman did not object during the June 18
 meeting to the characterization that he was conflicted.  Drawing all reasonable
 inferences in favor of Bakerman, however, the Amended Complaint suggests that
 Einsidler and the SFIC lawyers did not have a DR 5-104(a) conflict in mind, but
 rather some broader interpretation of the duties of a general counsel requiring
 him to abdicate his interests entirely when his interests as an LLC member
 diverged from those of his employer.  Bakerman cannot be expected to correct
 the SFIC lawyers of their erroneous understanding of "conflict of interest,"
 provide them with an only slightly more plausible theory (DR 5-104(a)), and
 then remind them of the facts making this latter theory an empty threat--all in
 a span of thirty minutes, and without the benefit of his own counsel.

 (FN80.) *Reiver v. Murdoch & Walsh, P.A.,* 625 F.Supp. 998, 1014 (D.Del.1985)
 (holding that threats of termination of an at-will employee to obtain a release
 of already accrued benefits could form the basis of an action predicated on
 economic duress).

 (FN81.) *Robertazzi v. Cunningham,* 294 A.D.2d 418, 419 (N.Y.A.D. 2 Dept.2002)
 ("it is well established that there is no implied obligation of good faith and
 fair dealing in an employment at will").  In addition to Bakerman's residence
 and SFIC's doing business in New York, their employment relationship was
 centered in New York; New York law will therefore apply in determining the
 wrongful nature of threats made in New York to terminate such an employment
 relationship.  *See Restatement (Second) of Conflicts,* § 145.

 (FN82.) *Bormann v. AT & T Comm., Inc.,* 875 F.2d 399, 403 (2d Cir.1989).

 (FN83.) *Id.; EEOC v. Am. Express Publ'g Corp.,* 681 F.Supp. 216, 219
 (S.D.N.Y.1988).

 (FN84.) *Am. Express,* 681 F.Supp. at 220 ("Three days, while not conclusive as to
 involuntariness, is sufficiently short to create a question on the subject.").

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

(FN85.) Einsidler's response to Bakerman's request to speak with Sidney Frank could be viewed as discouraging Bakerman from consulting anyone during his thirty-minute deliberation period.

(FN86.) *Fluharty,* 193 A. at 840.

(FN87.) *Hanna,* at 7.

(FN88.) Am. Compl., ¶ ¶ 67-69; 80. *See Hanna,* 1985 WL 21128, at *4 (finding that unreasonable delay in seeking consent until shortly before the transaction contributed to overcoming party's will). According to the Amended Complaint, defendants intentionally surprised Bakerman on the eve of a multi-billion dollar transaction that might disintegrate unless he signed the consent.

(FN89.) Bakerman was likely lulled by the misinformation of an allocation by thirds, delivered by Peltz in the SFIC hallways a day earlier.

(FN90.) At this point, there is no need to address Bakerman's alternative argument, that even if his consent had been given freely, it would only have the effect of shifting the burden of proof onto him in the entire fairness analysis.

**21 (FN91.) *Cantor Fitzgerald, L.P. v. Cantor,* 2000 WL 307370, at *24 (Del. Ch. Mar. 13, 2000) citing *NTC Group, Inc. v. West Point-Pepperell, Inc.,* C.A. No. 10665, slip op. (Del. Ch. Oct. 17, 1990).

(FN92.) *Cianci,* 2000 WL 1234647, at *12.

(FN93.) This issue was not directly addressed by defendants in their opening brief, and only footnoted in their reply brief. Defs.' Reply Br. at 15 n. 11.

(FN94.) Am. Compl., ¶ 109.

(FN95.) *See Clements v. Rogers,* 790 A.2d 1222, 1238 (Del. Ch.2001) (citing *Frank v. Wilson & Co., Inc.,* 9 A.2d 82, 87 (Del. Ch.1939), *aff'd,* 32 A.2d 277 (Del.1943)).

(FN96.) *In re Best Lock S'holder Litig.,* 845 A.2d 1057, 1080-81 (Del. Ch.2001).

(FN97.) Einsidler acknowledged Bakerman's lack of acquiescence by interpreting Bakerman's refusal to sign a release as indicating that Bakerman was going to sue defendants. Am. Compl., ¶ 112.

(FN98.) *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del. Ch.1999)

(FN99.) *Id.*

(FN100.) *ID Biomedical Corp. v. TM Technologies, Inc.,* 1995 WL 130743, at *15

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

(Del. Ch. Mar. 16, 1995).

(FN101.) *See, e.g., Student Fin. Corp. v. Royal Indem. Co.,* 2004 WL 609329, at *7 (D.Del. Mar. 23, 2004) (rejecting motion to dismiss unjust enrichment claim where complaint alleged underlying contract was invalid and subject to rescission because of fraudulent conduct and omissions).

(FN102.) *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 24 (Del.2001) (applying New York law, terms of contingent value rights controlled); *ID Biomedical.,* 1995 WL 130743, at *15 (applying Delaware law).

(FN103.) *Albert v. Alex. Brown Mgmt. Servs.,* 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005) (partnership agreement and fiduciary duties between managers and unitholders controlled, to the exclusion of unjust enrichment claim).

(FN104.) A derivative claim may only be brought by a shareholder who continues to hold the shares of the corporation on whose behalf the shareholder is suing. *See* Ct. Ch. R. 23.1. *See also Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031 (Del.2004).

(FN105.) *Tooley,* 845 A.2d at 1033.

(FN106.) *In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 997 (Del. Ch.2004).

(FN107.) *See Gentile v. Rossette,* 2006 WL 2388934, at *7 (Del.2006) (finding public shareholders directly harmed by dilution of voting power redistributed to controlling shareholder).

(FN108.) *See* Ct. Ch. R. 8(a)(1).

(FN109.) *VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del.2003).

(FN110.) Am. Compl., ¶ 122.

(FN111.) *Id.* at ¶ ¶ 123-124.

(FN112.) *Id.* at ¶ 125.

(FN113.) *Chamison v. Healthtrust, Inc.,* 735 A.2d 912, 920 (Del. Ch.1999).

(FN114.) *Id.*

(FN115.) *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del.1998).

(FN116.) *Fitzgerald v. Cantor,* 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

**21  (FN117.) *See Bonham v. HBW Holdings, Inc.,* 2005 WL 3589419, at *10-11 (Del.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

2006 WL 3927242, Bakerman v. Sidney Frank Importing Co., Inc., (Del.Ch. 2006)

Ch. Dec. 23, 2005).

(FN118.) *Steele v. Ratledge,* 2002 WL 31260990, at * 2 (Del. Ch. Sept. 20, 2002).

(FN119.) *Shearin v. E.F. Hutton Group, Inc.,* 652 A.2d 578, 590 (Del. Ch.1994) ("It is rudimentary that a party to a contract cannot be liable both for breach of that contract and for inducing that breach."); *see also Winicki v. City of Olean,* 611 N.Y.S.2d 379 (N.Y.App.Div.1994).

© 2007 Thomson/West. No claim to original U.S. Govt. works.

# TAB B

Citation/Title
1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

**\*529587**      Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.   CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

**RE:  KIRKWOOD KIN CORP. and John O'Connor**

**v.**

**DUNKIN' DONUTS, INC., Sean O'Hanlon and O'Hanlon, Inc.**

**No. 94C-03-189-WTQ.**

Jan. 29, 1997.

Letter Opinion and Order on Defendant Dunkin' Donuts, Inc.'s Motion for Summary Judgment on all Claims against it and on its Counterclaim--GRANTED with respect to Counts I, II, VI, IX, X, XI, XII, XIII, and XIV of the Second Amended Complaint;  DENIED with respect to Counts III, IV, V, VII, and VIII of the Second Amended Complaint;  and DENIED with respect to the Counterclaim.

James S. Green, Duane, Morris & Heckscher, Wilmington.

Edward F. Eaton, Connolly, Bove, Lodge & Hutz, Wilmington.

QUILLEN, Associate J.

Dear Counsel:

**\*\*1**   This is the Court's opinion on multiple motions by defendant Dunkin' Donuts, Inc., seeking summary judgment, pursuant to Superior Court Civil Rule 56, on all claims brought against it by plaintiffs Kirkwood Kin Corporation and John O'Connor, and on its counterclaim against plaintiffs.  For the reasons herein stated, the Motions are GRANTED with respect to Counts I, II, VI, IX, X, XI, XII, XIII, and XIV of the Complaint, DENIED with respect to Counts III, IV, V, VII, and VIII, and DENIED with respect to the counterclaim.

*FACTUAL BACKGROUND*

As the Court stated in its opinion of June 30, 1995, this case involves a dispute between plaintiffs Kirkwood Kin Corp. and John O'Connor (collectively "plaintiffs" or "the franchisee"), as the former operators of two donut shop franchises;  defendant Dunkin' Donuts, Inc. ("Dunkin' " or "the franchisor"), as the franchisor;  and defendants Sean O'Hanlon and O'Hanlon, Inc. (collectively "O'Hanlon"), as a competing franchise.

Plaintiffs purchased a Dunkin' Donuts franchise, located on Kirkwood Highway, from Dunkin' in 1984.  In August 1986, plaintiffs renewed their franchise.  As

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

part of this renewal, plaintiffs executed an amendment to the sublease which contained provisions for the payment of a percentage rent and what purports to be a general release.  The base rent was $35,747.64.  The percentage rent provision required plaintiffs to pay Dunkin', in addition to the base rent, 7% of gross sales over $165,000.  In August 1987, plaintiffs again renewed the franchise, executing an amendment to the sublease which maintained the rent terms and contained another purported general release.  Plaintiffs estimate that from 1985 to 1990 the retail sales at their Kirkwood shop grew at an average annual rate of 8%.

In November 1990, a newly-licensed Dunkin' shop in Pike Creek was opened by another franchisee, approximately 1.5 miles from plaintiffs' Kirkwood shop.  Plaintiffs claim that Dunkin' made no effort to ascertain the potential impact on plaintiffs' store prior to opening the Pike Creek shop.  They also claim that their sales dropped by 13% in the following year.  In what plaintiffs assert was an attempt to recover from the "blow" dealt by the opening of the Pike Creek shop and an attempt to get out from under the "oppressive" percentage rent provision, plaintiffs sought and Dunkin' granted a second franchise.  This was a satellite shop (FN1) located on the corner of 9th and Orange Streets in downtown Wilmington and opened in January 1993.

In that same month, Dunkin' created another Dunkin' franchise on the same side of Kirkwood Highway, about 1.3 miles east of plaintiffs' shop.  This franchise was owned by the O'Hanlon defendants.  Dunkin' had purchased the Mister Donut chain of donut shops approximately three years prior to this conversion.  At that time, the O'Hanlon defendants had been operating a Mister Donut franchise.  In January 1993, pursuant to a nationwide program instituted by Dunkin' to convert as many Mister Donut franchises to Dunkin' Donuts franchises as was possible, Dunkin' converted O'Hanlon's Mister Donut shop to a Dunkin' Donuts shop.  Plaintiffs claim that their retail sales after the conversion dropped precipitously and that the O'Hanlon Dunkin' franchise's sales increased dramatically.

**2   By February 1993, plaintiffs were no longer able to meet all of their financial obligations.  They stopped paying the percentage rent due under the amended sublease to Dunkin'.  By May 1993, plaintiffs had also stopped paying the base rent and franchise and advertising fees which they owed to Dunkin'.  On July 16, 1993, Dunkin' issued a notice of default to plaintiffs based on their nonpayment of contractual obligations.  These alleged defaults were not cured by plaintiffs.  Dunkin' issued a notice of termination of the franchise agreements on August 24, 1993.  However, plaintiffs assert that O'Connor contacted a Dunkin' business consultant to discuss plaintiffs' various financial problems and to solicit assistance in reaching a resolution of these issues.  Plaintiffs assert that Dunkin' refused to even discuss the problems with them, although they allegedly were required to address at least the "proximity related problems," unless and until plaintiffs paid the money which they owed to Dunkin'.

Plaintiffs did not turn over the franchises and instead remained in possession

© 2007 Thomson/West. No claim to original U.S. Govt. works.

Page 3

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

of the franchises, operating under the Dunkin' Donuts trademark.  In the meantime, Dunkin' had sued plaintiffs in the Court of Chancery seeking to terminate the franchise agreements and in the Justice of the Peace Court seeking to have plaintiffs relinquish possession of the premises.  Plaintiffs then instituted this action in Superior Court.  Plaintiffs finally settled the Justice of the Peace Court action by turning over possession of the businesses to Dunkin' in October 1994.  The Court of Chancery action has been stayed pending the outcome of this action.

*PROCEDURAL BACKGROUND*

On March 21, 1994, Kirkwood filed a nine count Complaint in Superior Court against Dunkin' alleging violations of Delaware's Franchise Security Law, 6*Del. C.* ch. 25, and various derivative contract and tort claims.  Dunkin' counterclaimed against Kirkwood for breach of contract based on Kirkwood's purported defaults under the rental and fee agreements with Dunkin'.  On August 19, 1994, plaintiffs filed an Amended Complaint, adding an additional count against Dunkin' and adding the O'Hanlon defendants as a party.

On March 20, 1995, this Court (Judge Silverman) heard Defendants' Motion to Dismiss and for Partial Summary Judgment.  In an opinion dated June 30, 1995, the Court, recognizing the early stage of the litigation, attempted to give the parties guidance and help define the scope of the case.  In particular, the Court permitted Kirkwood to amend the complaint a second time and to "narrow their claims so that the Court can focus on the essence of their dispute."  Plaintiffs did not pay much heed to this request, as they then filed an*eighteen* count Second Amended Complaint on August 31, 1995.  Several of the claims are repetitive in that the alleged basis for liability is the same but the alleged facts specifically giving rise to the liability differ.  Plaintiffs alleged that Dunkin' committed the following unlawful acts:

**3    (1) violated 6 *Del. C.* § 2552 by charging excessive rent in light of Dunkin's interests and purposes (Count I);

(2) violated 6 *Del. C.* § 2552(j) by refusing to renew the franchise except upon payment of excessive rent (Count II);

(3) violated 6 *Del. C.* §§ 2552(g) and 2553(a) by attempting to unjustly terminate plaintiffs' franchise (Counts III, V, and VII);

(4) violated 6 *Del. C.* §§ 2552(g) and 2553(a) by unjustly terminating plaintiffs' franchise (Counts IV, VIII);

(5) violated 6 *Del. C.* §§ 2552(i) and 2553(b) by unjustly refusing to deal with plaintiffs (Count VI);

(6) violated a contractual obligation to offer mediation in order to resolve their dispute (Count IX);

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

    (7) engaged in intentional misrepresentations by giving false assurances that it would help plaintiffs promote the business (Count X);

    (8) engaged in intentional interference with existing business relationships (Count XI) and with prospective business advantages (Count XII);

    (9) violated an implied covenant of good faith and fair dealing (Count XIII); and

    (10) obtained unjust enrichment by charging and collecting unreasonable rent fees (Count XIV).

Plaintiffs alleged that the O'Hanlon defendants committed the following unlawful acts:

    (1) engaged in intentional interference with existing business relationships (Count XV) and with prospective business advantages (Count XVI);

    (2) engaged in intentional interference with the contractual relationship between plaintiffs and Dunkin' (Count XVII); and

    (3) conspired with and knowingly and wilfully aided and abetted Dunkin' in Dunkin's breaches of covenants, representations, and warranties (Count XVIII).

On August 27, 1996, Dunkin' filed a new Motion for Partial Summary Judgment. While the Motion was pending, Dunkin' filed, on November 22, 1996, a Motion for Summary Judgment on all claims against it. On November 25, 1996, Dunkin' filed its Motion for Summary Judgment on its Counterclaim. Oral argument was scheduled for December 11, 1996. Shortly before oral argument, counsel for plaintiffs informed the Court that it had reached a resolution of its dispute with the O'Hanlon defendants and that a stipulation of dismissal would be forthcoming. (FN2) This is the Court's decision after oral argument.

*STANDARD ON SUMMARY JUDGMENT*

When considering a motion for summary judgment under Superior Court Civil Rule 56, the Court's function is to examine the record to determine whether genuine issues of material fact exist. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* Del.Super., 312 A.2d 322, 325 (1973). If, after viewing the record in a light most favorable to the non-moving party, the Court finds there are no genuine issues of material fact, summary judgment is appropriate. *Id.* The Court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is "potentially possible." *Rochester v. Katalan,* Del.Supr., 320 A.2d 704 (1974). All reasonable inferences must be drawn in favor of the non-moving party. *Sweetman v. Strescon Indus.,* Del.Super., 389 A.2d 1319 (1978). Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

in order to clarify the application of law to the circumstances. *Ebersole v. Lowengrub*, Del.Supr., 180 A.2d 467 (1962).

COUNT I

**\*\*4**   In Count I of the Second Amended Complaint, plaintiffs contend that Dunkin' violated 6 *Del. C.* § 2552(j) by charging excessive rent in light of Dunkin's interests and purposes in the property:

> Notwithstanding any terms of the franchise agreement to the contrary, no franchisor who leases real or personal property to a franchised distributor may charge the franchised distributor a rent or other charge for the use or occupancy of such real or personal property which is unreasonable or excessive in light of the franchisor's interest in such real or personal property, and the purpose to which the real or personal property is being used.  The refusal of the franchisor to renew a lease for real or personal property except upon the payment of a rent or other charge which is unreasonable or excessive in light of the use to which the property has been placed by the franchisor and/or the interest of the franchisor in the real or personal property shall be deemed to be an unjust termination of the franchise.

*Id*.  Dunkin' asserts that summary judgment is appropriate with respect to on this count on any of several grounds.

The first ground put forth by Dunkin' is that charging unreasonable and excessive rent alone is not a violation of the Franchise Security Law. Specifically, Dunkin' argues that the "remedies" section of the statute does not provide a cause of action based on the charging of unreasonable or excessive rent:

> (a) If a franchisor (1) unjustly terminates a franchise, or (2) unjustly fails or refuses to renew a franchise, or (3) threatens, or attempts, or gives notice that it intends to attempt unjustly to terminate a franchise, or (4) threatens, or attempts, or gives notice that it intends to attempt unjustly to refuse to renew a franchise, then the franchised distributor whose franchise is threatened shall be entitled to recover damages from the franchisor....

> (b) [...] if a franchisor unjustly refuses to deal with a franchised distributor with whom the franchisor has been dealing for at least 2 years, the franchised distributor shall be entitle to recover damages from the franchisor pursuant to subsection (a) of this section plus all other damages ... allowed under the law of this State....

6 *Del. C.* § 2553.  Dunkin' argues that a claim for the payment of unreasonable or excessive rent only accrues when it is charged in conjunction with a refusal or threatened refusal to renew.  Plaintiffs argue that Dunkin's reading "totally emasculates" the statute and that it is absurd to suggest that charging excessive rent is illegal if demanded upon renewal of a lease but legal if demanded in the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

Page 6

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

initial term.  In other words, the dispute between the parties centers on whether the first sentence of subsection (j) confers an independent cause of action, since plaintiffs in Count I only allege the charging of an excessive and unreasonable rent.

The Court concludes that the statute is meant to confer protection against the charging of an unreasonable or excessive rent only in the context of an already-existing franchise agreement or an accompanying sublease.  That is, contrary to plaintiffs' assertions, it is not at all absurd to suggest that charging excessive rent is illegal if demanded upon renewal of a lease but legal if demanded in the initial term.  The preamble to the Franchise Security Act indicates otherwise.

**5**  AN ACT ...  TO PROTECT FRANCHISED DISTRIBUTORS FROM UNJUST TERMINATION OF, OR FAILURE OR REFUSAL TO RENEW THEIR FRANCHISES.

WHEREAS, the relationship between franchised distributors and their suppliers and licensors is marked by economic dependence of the franchised distributor;  and

WHEREAS, the suppliers and licensors of franchised distributors have terminated franchises on short notice without just cause, and have threatened and continued to threaten such termination;  and

WHEREAS, such unjustified terminations unfairly deprive franchised distributors of their equity and the fruits of their labor after they have created a favorable market for the products, trademarks, and trade names of their suppliers and licensors;  and

WHEREAS, such terminations eliminate jobs, eliminate the productivity of going concerns and otherwise adversely affect the economic stability of this state;  and

WHEREAS, such terminations interrupt the free and continuous flow of communication and information to the people of this state when the franchised distributor is a wholesaler of publications, and thereby interfere with the ability of the people to keep informed on public issues;  and

WHEREAS, these conditions are detrimental to the public interest and general welfare of this state;  and

WHEREAS, these detrimental conditions cannot be remedied through bargaining because of the franchised distributors' lack of bargaining power.

57 *Del. Laws* ch. 693.

As the title and preamble make clear, the protections of this statute are intended to protect franchised distributors only from "unjust termination of, or

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

failure or refusal to renew their franchises."   The General Assembly was concerned with the unjust, inequitable, and coercive practices of franchisors in the context of an already-existing franchise relationship, that is, at a time when the economic balance of power rests with the franchisor.  *See Globe Liquor Co. v. Four Roses Distillers Co.,* Del.Supr., 281 A.2d 19, 23,*cert. denied,* 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971) (recognizing that the purpose of the Act was to protect a franchisee who is "economically dependent upon the sale of the [franchisor's] products and who has used his efforts in promoting them"); *Paradee Oil Co. v. Phillips Petroleum Co.,* Del. Ch., 320 A.2d 769, 775 (1974), *aff'd,* Del.Supr., 343 A.2d 610 (1975) (citing *Globe Liquor* and the preamble to the Act).

Once the franchise is in place, the franchisee presumably goes to great lengths and expends great amounts of time and money to ensure the success of his venture and to create a "favorable market" for the franchisor.  It is in this sense that the franchisee builds up the "equity" and "fruits of [his] labor" from the franchise relationship.  Prior to entering into that relationship, there is no huge inequity in the balance of power.  Any potential franchisee from whom an unreasonable and excessive rent is charged as a condition of entering into the franchise relationship is free to walk away from the bargaining table.  In fact, the simple laws of economics would suggest that any franchisor who constantly charges unreasonable and excessive rents as a condition of granting the franchise will quickly discover that it has few takers.  Charging excessive and unreasonable rents, alone, may violate some other law, but it does not violate the Franchise Security Act.

**\*\*6**   This reasoning is supported by the language of all of §§ 2552 and 2553. First, § 2552 is titled "Unjust termination of, or failure to renew, a franchise."   Second, the entire tenor of § 2552 is to speak consistently of either the termination of or the failure to renew a franchise.  To attribute to the first sentence of § 2552(j) the independent cause of action which plaintiffs propose would render that sentence out of place with the remainder of the section, especially since the lead-in "Notwithstanding" clause appears to refer to an existing agreement.  Third, nowhere in § 2553, the "remedies" portion of the subchapter, is a remedy given for only the charging of unreasonable or excessive rent.  *See* 6 *Del. C.* § 2553, quoted *supra.*   Rather, the damages recoverable pursuant to this chapter, described in part in subsection (c), employ phrases such as "used with respect to the terminated or unrenewed franchise" and "loss of profits ... by virtue of the terminated franchise."   6 *Del. C.* § 2553(c)(1), (3).

In the Court's opinion, the language of §§ 2552 and 2553, read in conjunction with the title and preamble of 57 *Del. Laws* ch. 693 and relevant case law, does not grant a franchisee a cause of action for the charging of unreasonable or excessive rent absent threatened, attempted, or actual termination or nonrenewal of the franchise.  Since Count I of the Second Amended Complaint does not plead or allege the charging of such rent under any of those circumstances, it fails to state a cause of action under the Franchise Security Law.  Summary judgment as to

© 2007 Thomson/West. No claim to original U.S. Govt. works.

Page 8

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

Count I of the Second Amended Complaint is therefore GRANTED.  (FN3)

*COUNT II*

In Count II of the Second Amended Complaint, plaintiffs allege that Dunkin' violated 6 *Del. C.* § 2552(j) by refusing to renew the sublease in 1986 and 1987 except upon payment of unreasonable and excessive rent, which constitutes an unjust termination entitling plaintiffs to damages under 6 *Del. C.* § 2553.  Such a claim clearly states a cause of action under the statute.

Dunkin's first defense on this count is that the claim is time-barred by 10*Del. C.* § 8106, the general three-year statute of limitations.  As Dunkin' argues, the 1986 and 1987 sublease agreements were formed more than three years prior to the institution of this action and, therefore, claims relating to them are time-barred.  In response, plaintiffs argue several grounds for the inapplicability of 10 *Del C.* § 8106.  First, they argue that it is "undisputed" that the agreements in question are contracts under seal.  This issue was addressed by Judge Silverman in his thoroughly-researched and well written opinion on Dunkin's earlier Motion for Summary Judgment.  *See Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.,* Del.Super., C.A. No. 94C-03-189, Silverman, J. (June 30, 1995), mem. op. at 13-18 (Docket No. 63).  In that opinion, Judge Silverman concluded the following:

Except where mortgages are concerned, the simple use of formalities and boilerplate unaccompanied by substantive evidence of the parties' intent to seal it is not enough to turn an ordinary contract into a specialty.  *American Tel. & Tel.* [*Co. v. Harris Corp.,* Del.Super., C.A. No. 92C-01-27, Jacobs, V.C. (Sept. 9, 1993)], Mem. Op. at 14 n. 6; *but see Peninsula Methodist Homes and Hosp., Inc. v. Architect's Studio, Inc.,* Del.Super., C.A. No. 83C-AV-118, Gebelein, J. (Aug. 28, 1985) Let.  Op. at 3 (contract bearing testimonium clause and printed "seal" near signatures is under seal even without language in the body or extrinsic evidence of parties' intent).... *[T] he Court will allow discovery to develop extrinsic evidence of the parties' intent with respect to sealing the documents* ....  Plaintiffs must remember that evidence of any intent on Plaintiffs' part to seal the agreements is insufficient unless they communicated their desire to Dunkin'.  *American Tel. & Tel.,* Mem. Op. at 12-13.

**7  *Id.* at 17-18 (emphasis added).  Judge Silverman's statement is the law of the case.

In a deposition taken July 18, 1996, O'Connor testified that he never discussed sealing the agreements with Dunkin', that he just assumed that the language in the agreements would have the effect of sealing those agreements.  *See* Ex.  A at 126-27, Dunkin' Mot. for Partial Summ. J. (Docket No. 97); Ex.  C at 126-27, Pl. Resp. to Dunkin' Mot. (Docket No. 120).  This apparent lack of communication would appear to foreclose the possibility of the necessary communication of the intent to seal, and with it plaintiffs' argument that the contracts are under

© 2007 Thomson/West. No claim to original U.S. Govt. works.

Page 9

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

seal. Nevertheless, plaintiffs argue that the mere fact that the agreements themselves contain the required seal language and the fact that each party forwarded the agreements to each other satisfies the requirement that they communicate their desire to seal the agreements. *See* Pl. Resp. to Dunkin' Mot. at 3-4 (Docket No. 120). Stripped to its particulars, plaintiffs' argument is that the seal language in the lease agreements demonstrates the parties' intent to make valid the seal language in the lease agreements. Yet Judge Silverman had those documents before him and rejected them as being insufficient. He specifically granted plaintiffs additional discovery to develop *extrinsic* evidence of intent. The lease agreements clearly are not *extrinsic* evidence, and plaintiffs have therefore failed to present the evidence which this Court stated was necessary in order to demonstrate the parties' intent to seal the agreements. In view of plaintiffs' complete failure to offer the necessary extrinsic evidence after having been told what was needed, the Court adheres to Judge Silverman's ruling and holds that the lease agreements are not under seal and are therefore not for that reason exempt from 10 *Del C.* § 8106.

Plaintiffs' second argument for the inapplicability of the statute of limitations is that Dunkin's charging of an allegedly unreasonable and excessive rent were monthly, "continuing" abuses that toll the statute of limitations. As with the contracts under seal claim, Judge Silverman ably addressed this issue in his opinion on Dunkin's first motion:

Plaintiffs in the instant case provide no evidence of the chronology underlying their claims. They simply serialize Dunkin' alleged wrongs--calling Dunkin's charging of allegedly excessive rent, and operation of the Pike Creek and O'Hanlon franchises, "monthly" and "daily" abuses, respectively--and demand application of the continuing wrong doctrine. This begs the question, as "continuing wrong" status turns on the substantive nature of the contract and the alleged wrongs.... The Court will allow the parties to provide additional facts directed towards resolving whether Plaintiffs' claims challenge the initial formation of the franchise and lease agreements, or subsequent events (or both). If it turns out that Plaintiffs' claims involve nothing more than complaints regarding the formation of the contracts, they will be considered time-barred, pursuant to *Kahn* [v. *Seaboard Corp.*, Del. Ch. 625 A.2d 269 (1993) (FN4)]....

**8 Mem. op. at 21-22 (Docket No. 63). However, neither party has provided any additional evidence with respect to this count regarding the nature of the 1986 and 1987 lease agreements.

Plaintiffs nonetheless argue (1) that the monthly charging of unreasonable or excessive rent constitutes a continuing wrong sufficient to toll the statute of limitations applicable to its Franchise Security Law claim in Count II, and (2) that the claims involve "the very essence of contracts." Given Judge Silverman's ruling, plaintiffs' argument must be rejected, and the Court does so here. As the Court noted with respect to Count I, charging an unreasonable or excessive rent, without more, is not a violation of the Franchise Security Law

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

and therefore cannot be the substantive basis of these contracts. It is, instead, the refusal to renew the franchise, except upon payment of such rent, that is the wrongful act at issue in Count II. That wrongful act occurs at the time of the alleged refusal to renew, since plaintiffs' real complaint concerns what Dunkin' allegedly did, that is, demanded, at the time of renewal. *Accord Simmons v. Mobil Oil Corp.,* 9th Cir., 29 F.3d 505, 511 (1994) (holding "[i]t is the nonrenewal of [the franchise agreement] that [[plaintiff] complains of, because his claim arises from what he alleges Mobil did at the time of renewal," and rejecting as time-barred the franchisee's excessive rent claim). Consequently, under the Court of Chancery's decision in *Kahn,* and consistent with the law of this case, the Court rules that the wrongs alleged here occurred at the contract formation stage. As a result, plaintiffs have failed to bring their claim within the three-year statute of limitations period of 10 *Del C.* § 8106. Count II is consequently time-barred. Summary judgment is GRANTED as to Count II of the Second Amended Complaint. (FN5)

### COUNTS III, IV, V, VII, & VIII

Counts III, IV, V, VII, and VIII of the Second Amended Complaint allege that Dunkin' engaged in attempted and actual unjust terminations of the franchise in violation of the Franchise Security Law. Plaintiffs allege attempted unjust terminations by (1) granting nearby franchises when Dunkin' knew or should have known that granting these franchises would harm plaintiffs' business (Count III); (2) granting special incentives and exception to the O'Hanlon shop which Dunkin' knew or should have known would harm plaintiffs' business (Count V); and (3) granting nearby franchises and charging unreasonable and excessive rents, which caused a decline in business, which in turn caused plaintiffs' nonpayment, which in turn caused Dunkin's attempted termination (Count VII). Plaintiffs allege actual unjust termination by (1) granting nearby franchises and charging unreasonable and excessive rent, which caused a decline in business, which in turn caused nonpayment, which in turn caused Dunkin's unjust termination (Count IV); and (2) the same as (1), except that the downtown satellite site is included (Count VIII).

**\*\*9** The gist of these counts concerns not so much Dunkin's actual "termination" of the franchise, but rather its actions before then. In other words, Dunkin' never actually tried to "terminate" the franchise by word, that is "officially" until August 1993, but the effect of its prior deeds was to terminate plaintiffs' franchise. This may best be described as a "constructive" or "*de facto* " termination.

This Court, in its earlier opinion on Dunkin's prior motion, assumed without deciding that an unjust termination could be effected constructively, finding that there was insufficient evidence in the record to decide at that time. Upon further review, the Court concludes that the Franchise Security Law does permit a cause of action for constructive or *de facto* termination. Admittedly, 6 *Del. C.* §§ 2552 and 2553 appear to concern, as Dunkin' argues, only actual, attempted, or threatened termination or non-renewal of the franchise relationship. This might

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

suggest that only an affirmative termination, such as the August 24, 1993 letter from Dunkin', qualifies, since nowhere in the Franchise Security Law is a cause of action expressly given for a constructive termination or an attempted constructive termination.

Such a position, however, exalts form over substance and in many respects does violence to the intent of the General Assembly in enacting the Franchise Security Law. The Franchise Security Law's purpose, generally speaking, is to remedy the imbalance of power in the franchise relationship by adding a few statutory pounds to the franchisee's side of the scales. To hold that only a formal termination affords a franchisee the protections of the Franchise Security Law would very well render those protections illusory. It "otherwise would allow franchisors to accomplish indirectly that which they are prohibited from doing directly." *Petereit v. S.B. Thomas, Inc.,* 2d Cir., 63 F.3d 1169, 1182 (1995), *cert. denied,* 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1986) (construing Connecticut's franchise law). Actions sanctified by such a holding would "epitomize the very abuse of power which the statute seeks to prevent." *Id.*

In the Court's opinion, the question that the Franchise Security Law really asks is whether the actions alleged are so egregious as to amount to a repudiation of the contract. This will permit a factual review of each claim on its merits, with particular attention paid both to the motivations *and* the actions of the franchisor. It seems to the Court that if, in fact, Dunkin' did undertake to destroy plaintiffs' franchise, causing plaintiffs to lose so much money that they were forced to default and give Dunkin' a pretext for terminating the franchise, the Franchise Security Law not only gives, but*demands* that plaintiffs be afforded a remedy.

The Court reaches this conclusion notwithstanding the holding of the Court of Chancery in *Dave Greytak Enterprises v. Mazda Motors of American, Inc.,* Del. Ch., 622 A.2d 14, *aff'd without op.,* Del.Supr., 609 A.2d 668 (1992). Since the Court of Chancery's decision concerned Delaware's Motor Vehicle Franchise Protection Act, 6 *Del C.* ch. 49, its application to the Franchise Security Law is questionable. In that decision, the Court of Chancery declined to recognize a cause of action for "effective termination" with respect to Delaware's Motor Vehicle Franchise Protection Act, 6 *Del C.* ch. 49. The Court of Chancery held that the express terms of 6 *Del C.* § 4906 (FN6) concerned only actual or express terminations or cancellations, and that the plaintiff's claim for "effective termination" was nowhere used in the statute and thus failed to state a cause of action under the section. (FN7) It also held that the motor vehicle franchise in question here was not a franchise within the meaning of the Franchise Security Law. This Court is not certain the extent to which the Court of Chancery sought to foreclose the possibility that an automobile manufacturer/franchisor could ever effect a constructive termination of a motor vehicle franchise, but suspects, given the short nature of the Court of Chancery's treatment of this issue and the factual context of that case, that such uniform, absolute foreclosure may not have been intended. (FN8)

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

**\*\*10**  That being said, the Court has grave doubts concerning whether plaintiffs will in fact be able to recover.  There are a fair number of anomalies in plaintiffs' position.  For example, if Dunkin' were indeed perpetrating a "scheme to obtain Plaintiffs' business" (FN9) by charging excessive rent and granting competing franchises, then why would Dunkin' grant plaintiffs the opportunity to open a satellite franchise in downtown Wilmington?   Why would Dunkin' tell O'Connor to pay himself a more generous salary as a reward for his hard work if Dunkin' was trying to drive him out of business?   If the impact of the other shops' openings was, as O'Connor testified, "dramatic and immediate," then why did plaintiffs not attempt to invoke the adverse impact procedures Dunkin' had in place?   If plaintiffs are convinced that Dunkin' had a scheme to force them into default, then why did O'Connor answer "no" when asked if he had any evidence to suggest that Dunkin' was, in fact, attempting to perpetrate just such a scheme? (FN10)   How could a *national* plan to convert all Mr. Donut franchises to Dunkin' franchises be undertaken with the purpose of destroying plaintiffs' franchise? Plaintiffs may have a tough row to hoe, but they will get their chance.  Summary judgment with respect to each of the unjust attempted and actual termination claims in Counts III, IV, V, VII, and VIII of the Second Amended Complaint is hereby DENIED.

### COUNT VI

Plaintiffs allege in Count VI of the Second Amended Complaint that Dunkin' engaged in an "unjust refusal to deal" with them in violation of 6 *Del. C.* § 2552(i) of the Franchise Security Law.  Specifically, plaintiffs allege that O'Connor requested a meeting with Dunkin' to discuss and resolve the rent and competing shop problems plaintiffs were experiencing, but Dunkin' allegedly refused to meet with plaintiffs and instead terminated the franchise agreements, brought the termination actions, and refused to allow plaintiffs to sell all or part of the business.

Section 2552(i) states that "[n]o franchisor may unjustly refuse to deal with a franchised distributor with whom the franchisor has been dealing for at least 2 years."  The Court of Chancery has interpreted this subsection to "cover a situation where the franchisor has not taken specific action to terminate the franchise but is attempting to purge itself of the relationship simply by refusing to deal with the franchise distributor any longer ." *Del-Way Petroleum Co. v. Phillips Petroleum Co.,* Del. Ch., C.A. No. 4802, Brown, V.C., 3 Del. J. Corp. L. 565, 1977 WL 2568 at \*4 (Mar. 10, 1977).  This reasoning comports with the title to § 2552:  "Unjust termination of, or failure to renew, a franchise." It also makes sense as a practical matter, since it would seem pointless to require a franchisor to continue to deal with a franchisee against whom it has already chosen to pursue the ultimate remedy of terminating the franchise.

A review of this case indicates that Dunkin' did not, in fact, refuse to deal with plaintiffs within the meaning of the Franchise Security Law.  O'Connor himself testifies by affidavit that he did not contact Tom McHugh, his representative at Dunkin', to discuss and resolve the rent and competing shop

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

issues until *after* he had received Dunkin's termination notices in August 1993. *See* O'Connor Aff. at 13 (Docket No. 123).   Since this section is meant to cover situations where Dunkin' has *not* taken specific action to terminate a franchise, the fact that the actions alleged here all occurred*after* that specific action was taken renders them insufficient to support a cause of action for violation of 6 *Del. C.* § 2552(i).   In light of plaintiffs' failure to offer any other evidence indicating that Dunkin' unjustly refused to deal with plaintiffs prior to its taking specific action to terminate the franchises, they have failed to state a claim under § 2552(i).   Summary judgment as to Count VI of the Second Amended Complaint is GRANTED.

*COUNT IX*

   **11   In Count IX of the Second Amended Complaint, plaintiffs allege that Dunkin' failed to offer plaintiffs the opportunity to mediate their dispute prior to resorting to the courts, as they were contractually obligated to do under a Mediation Agreement between Dunkin' and the Center for Public Resources, Inc. ("CPR"), to which plaintiffs are third-party beneficiaries.   Pursuant to the Mediation Agreement, Dunkin' voluntarily agreed to a mediation process designed to help franchisors and franchisees resolve disputes without resorting to litigation.   According to plaintiffs, Dunkin' did not inform plaintiffs of the existence of this agreement, nor did Dunkin' ever offer plaintiffs the opportunity to mediate their dispute even after O'Connor first made contact with Tom McHugh in August 1993.   As a result, plaintiffs allege that they suffered damages, including attorney's fees, costs, and expenses incurred in defending this litigation.

   The Court dealt with this claim in its June 30, 1995 opinion.   In that opinion, the Court noted that Dunkin's own evidence indicated that Dunkin' did not notify plaintiffs of the possibility of mediation through the CPR program until the time when this litigation was filed.   The Court assumed without deciding that Dunkin' did not notify plaintiffs of the opportunity to mediate in a timely fashion, but ruled nevertheless that summary judgment was appropriate with respect to that claim:

   This count] essentially is a damage claim for Plaintiffs' having lost an opportunity to mediate certain complaints before they filed suit.   Only through speculation could damages be awarded on that basis.   Specifically, for Plaintiffs to recover, the fact-finder would have to conclude that Plaintiffs would have succeeded in mediation, Dunkin' would have accepted the result and would not have exercised its appeal rights, or [if it did] that such an appeal would have failed, since the mediation process contemplated by the CPR program is non-binding.... Damage claims cannot rest on such a tenuous foundation. *See, e.g., American Gen. Corp. v. Continental Airlines Corp.*, Del. Ch., 622 A.2d 1, 7 (1992), *aff'd*, [Del.   Supr.,] 620 A.2d 856 (1992).   Moreover, while the Court will not weigh the evidence now, Dunkin's contention that the parties eventually tried mediation without success lends support to the notion that Plaintiffs cannot establish a claim in [this count].

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

   Mem. op. at 10-11 (Docket No. 63).   In light of the fact that no additional evidence has been presented with respect to this claim, the Court has no reason to depart from its prior holding.   For the same reasons expressed in that opinion, summary judgment is GRANTED with respect to Count IX of the Second Amended Complaint.

*COUNT X*

   Count X of the Second Amended Complaint alleges a claim of fraudulent misrepresentation against Dunkin'.   Plaintiffs claim that Dunkin' fraudulently misrepresented to them that it would help them "promote and further the business and profitability of Kirkwood" and also "not take any action detrimental to Kirkwood's business interests."   At deposition, O'Connor was asked to describe these alleged representations with more specificity and replied with the following:

**12   I remember sitting down in my living room with Allen Lauer, who the title then was district sales manager....   I was very apprehensive over the extent to which I could remodel, the impact of this percentage rent.... [H]e took my sales up to that point and with a modest percent increase each year, which I had been more than doing to that point, he extrapolated on up past $2, 000 [A.D.2000] and said, I can remember the quotes, Look at where you will be so many years down the road.   And the other comment I can remember hearing was you were the only one on Kirkwood Highway.   Really trying to reassure me that I could handle both of these.

O'Connor Dep. of July 18, 1996 at 29, Ex. 1F, Dunkin' Mot. for Summ.   J. (Docket No. 115).

But they had advice for you.   They can give you help while you are working for them.   So I felt secure in that.   That was the first of what I would consider representations.   And the second one was when Allen Lauer gave me his projection and I can still hear the words, it will be on my gravestone:   You will be the only one on Kirkwood Highway.

O'Connor Dep. of July 18, 1996 at 461, Ex. 1G, Dunkin' Mot. for Summ.   J. (Docket No. 115).

   In response to a question asking for every representation, especially by a Dunkin' employee, that plaintiffs' business would grow and continue to be profitable, O'Connor stated the following:

I can't give times, dates, and places.   But there were times when every district sales manager I had was optimistic about with hard work and honesty that you can make a business really grow into something and make it a family business....   Rich Markell, totally forgot that he was one of the early characters back in '84.   Might have been my first district sales manager....   Then there was John Campbell before it from Concord Pike, Allen Lauer, Tom

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

McHugh, Bob Nelson.  I could be leaving somebody else out.  I mean, there were times when they all talked about being a Dunkin' Donut franchisee.  I mean you go to ad committees meetings.  This is what you can do.  This what you can do to be profitable and all of that.  We are here to help you.  Other than that, I can't give specifics on it.

O'Connor Dep. of July 18, 1996 at 463-64, Ex. 1G, Dunkin' Mot. for Summ.  J. (Docket No. 115).   Plaintiffs claim that it was the representations and assurances made by Dunkin's employees that caused them to execute the lease and franchise agreements.  Additionally, plaintiffs allege that these statements were false because Dunkin' charged plaintiffs unreasonable and excessive rent, licensed two competing Dunkin' franchises, failed to consult with plaintiffs about the impact of these new franchises, failed to offer those franchises to plaintiffs, granted special concessions to O'Hanlon, and terminated plaintiffs' franchise in bad faith and without good cause.

One of Dunkin's arguments in favor of summary judgment on this claim is that the integration clauses of the franchise agreements bar the use of parol evidence regarding representations or assurances relating to the contract matter.  While this general statement of the law is correct, it omits a well-recognized exception to the parol evidence rule.  When a party alleges fraud or misrepresentation, evidence of oral promises or representations made *prior* to the written agreement will be admitted.  *Anglin v. Bergold,* Del.Supr., 565 A.2d 279 (1989) (ORDER) at 4-5 (citing *Scott-Douglas Corp.,* 304 A.2d at 317).  Since at least some of the statements appear to have been made prior to the execution of the franchise and lease agreements, the Court will not grant summary judgment solely on the basis of the parol evidence rule and the integration clauses.

**\*\*13** Nevertheless, the Court finds that plaintiffs fail to state a claim for fraudulent misrepresentation.  The Delaware Supreme Court has repeatedly laid out the elements of this common law cause of action:

    (1) a false representation, usually one of fact, made by the defendant;

    (2) the defendant's knowledge or belief that the representation was false, or made with reckless indifference as to the truth;

    (3) an intent to induce the plaintiff to act or refrain from acting;

    (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation;  and

    (5) damage to the plaintiff as a result of such reliance.

*Gaffin v. Teledyne, Inc.,* Del.Supr., 611 A.2d 467, 472 (1992) .  (FN11) The Court has also held that mere expressions of opinion as to probable future events cannot be deemed fraud or misrepresentation.  *Consolidated Fisheries Co. v. Consolidated Solubles Co.,* Del.Supr., 112 A.2d 30, 37 (1955).  Furthermore, "any

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

complaint alleging fraud must as a consequence include the circumstances involved, i.e., the time, place, and contents of any misrepresentation made, the identity of the person making the same and the benefit sought to be obtained." *Stutchen v. Duty Free Int'l, Inc.,* Del.Super., C.A. No. 94C-12-194, Toliver, J., 1996 Del.Super.    LEXIS 187 (Apr. 22, 1996), mem. op. at 12 (citing *Nutt v. A.C. & S., Inc.,* Del.Super., 466 A.2d 18, 23 (1983), *aff'd, Mergenthaler v. Asbestos Corp. of America,* Del.Supr., 480 A.2d 647 (1984)).  This is an extension of the requirement of Superior Court Civil Rule 9(b) that "in all averments of fraud, negligence, or mistake, the circumstances constituting fraud, negligence, or mistake shall be stated with particularity."

   Count X on its face fails to satisfy the requirements of Rule 9(b) and the Court's opinion in *Stutchen.*  Plaintiffs did not allege the time or place of the misrepresentation *or* the identity of the person making it.  Dunkin' did not move to strike the claim, and plaintiffs have since supplemented the claim with selections from O'Connor's deposition testimony.  However, even this testimony fails to state a claim.  With regard to Mr. Lauer's alleged statements, the Court does not understand exactly how Mr. Lauer could have known in 1987 that Dunkin' would purchase the Mister Donut corporation in 1990 and convert the O'Hanlon shop to a Dunkin' shop in 1993.  Such knowledge is necessary in order to render knowingly false, *when made,* his alleged statement to O'Connor that plaintiffs would be the only ones on Kirkwood Highway.  Additionally, the Court does not see how Lauer's calculation of the percentage rent payments, using the formulas agreed to and clearly stated in the contracts, could have been false.  Finally, Lauer's projections as to the growth of plaintiffs' business clearly were nothing more than expressions of opinion as to future events based upon the extrapolation of past data.

   The statements alleged to other persons are similarly non-actionable.  First, O'Connor himself admits that he does not have the time, dates, or places of these alleged misrepresentations.  All three are required in order to state a cause of action for fraud.  While plaintiffs finally did put some names to the persons making representations, the representations O'Connor has testified to them making are nothing more than puffery, a verbal pat on the back from the franchisor meant to encourage the franchisee.  *Accord W & G Milford Assocs. v. Jeffcor, Inc.,* Del.Super., C.A. No. 89C-JN-161, Herlihy, J., 1991 Del.Super.    LEXIS 229 (Apr. 12, 1991), letter op. at 4 (regarding statements made to a shopping center tenant).  At best, they could perhaps be stated as opinion, which, as the Court has pointed out, is similarly non-actionable.

**\*\*14**  In conclusion, Count X fails to state a cause of action for fraudulent misrepresentation as a matter of law.  Summary judgment is GRANTED as to Count X of the Second Amended Complaint.

*COUNTS XI & XII*

   Counts XI and XII of the Second Amended Complaint purport to state claims for tortious interference with existing business relationships and prospective

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

business advantage.  They do not, however, identify a specific contract or potential business opportunity allegedly compromised by Dunkin'.  As the Court *explicitly* told plaintiffs in its earlier opinion, these specifics are a prerequisite to proceeding under these tort theories.  *See* June 30, 1995 Mem. op. at 24-25 (Docket No. 63).  The Court also told plaintiffs in no uncertain terms that they would have to "cite to actual or potential contracts, other than between themselves, possibly affected by Dunkin's behavior." *Id.* at 25.  The Court then allowed plaintiffs to amend their complaint so as to provide these specifics.  *Id.*

Unfortunately, plaintiffs do not appear to have understood what the Court meant by use of the phrase "specific contract or potential business opportunity."  All that plaintiffs' new but certainly not-improved tortious interference counts do is give a slightly less vague but equally uninformative general description of plaintiffs' operation of the shop.  As this Court told plaintiffs, more is required under Delaware law.  In another case, the Court of Chancery cogently explained it in the following manner:

[I]nterference with an existing contract requires (a) an intent to induce a breach (b) of an existing contract, (c) proximate causation, and (d) damages.... [A] showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with opportunity, (c) proximate causation, and (d) damages....

*DeBonaventura v. Nationwide Mut. Ins. Co.,* Del. Ch., 419 A.2d 942, 947 (1980), *aff'd,* Del.Supr., 428 A.2d 1151 (1981).

Here, plaintiffs have failed to demonstrate to the Court the existence of one single contract or prospective business opportunity.  Citations to sales records of plaintiffs' and O'Hanlon's shops are useless because, while they *might* show damages, they do not show the existence of the contract or prospective business opportunity.  This Court told plaintiffs that they needed to provide specific examples, yet plaintiffs failed to do so.  As such, plaintiffs have failed (twice) to state a cause of action for either tortious interference with existing contracts or with prospective business opportunities.  Summary judgment as to Counts XI and XII of the Second Amended Complaint is GRANTED.

### COUNT XIII

Count XIII of the Second Amended Complaint alleges a veritable multitude of violations of an implied covenant of good faith and fair dealing.  Plaintiffs assert that Dunkin' violated this covenant by (1) charging unreasonably and excessive rent for the Kirkwood Highway shop, (2) awarding competitive franchises in close proximity to the Kirkwood Highway shop, (3) failing to consult with plaintiffs about the impact of those franchise prior to granting them, (4) failing to offer those franchise to plaintiffs, (5) failing to investigate whether the new franchises would have an adverse impact on plaintiffs, (6)

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

granting special privileges and concessions to the O'Hanlon franchise, which conferred a competitive advantage on O'Hanlon to plaintiffs' detriment, (7) refusing to meet with plaintiffs to discuss and resolve plaintiffs' perceived problems, (8) terminating plaintiffs' franchise, and (9) bringing these termination actions in the courts.

**15** An implied covenant of good faith and fair dealing generally exists in every contract. *Katz v. Oak Indus., Inc.,* Del. Ch., 508 A.2d 873, 880 (1986). As the Court of Chancery has held, "[t]his obligation requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." *Wilgus v. Salt Pond Inves. Co.,* Del. Ch., 498 A.2d 151, 159 (1985). It is simply a reflection of the fact that in many respects the purpose of contract law is to attempt to give effect to the reasonable expectations of the parties. *See* RESTATEMENT (SECOND) CONTRACTS § 205. One common way of analyzing this covenant "is to ask what the parties likely would have done if they had considered the issues involved." *E.I. DuPont de Nemours & Co. v. Pressman,* Del.Supr., 679 A.2d 436, 443 (1996). *See also Katz,* 508 A.2d at 880 (asking "is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of ... had they thought to negotiate with respect to that matter?"). However, it is also true that "where the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty does not come into play." *Dave Greytak Enters.,* 622 A.2d at 23.

After some reflection upon the issue and consideration of the actions which plaintiffs allege constitute violations of the covenant, the Court concludes that with respect to at least some of the alleged actions, the implied covenant of good faith and fair dealing does not provide a remedy independent of the Franchise Security Law. In the Court's opinion, this common law *implied* covenant of "good faith" and "fair dealing" does not state an independent cause of action with respect to the actual, threatened, or attempted failure to renew or termination of a franchise relationship because the General Assembly*expressly* wrote that covenant into the Franchise Security Law.

The Franchise Security Law expressly prohibits unjust terminations and failures to renew, whether actual, threatened, or attempted, as well as unjust refusals to deal. *See* 6 *Del. C.* §§ 2552(g), (h), (i). It defines "unjust" as being without "good cause" or in "bad faith." *See* 6 *Del. C.* §§ 2552(a), (b). An "unjust refusal to deal" by its very terms cannot be said to be either good faith or fair dealing. To the extent, therefore, that plaintiffs make any of these allegations as breaching an implied covenant of good faith and fair dealing, these allegations are part and parcel of the General Assembly's statutory enactment. This encompasses the second, sixth, seventh, eighth, and ninth grounds listed above. Each of these grounds is separately alleged in other counts of the Complaint dealing with the Franchise Security Law, (FN12) and any remedy which plaintiffs seek must be sought under that law.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

**\*\*16** Some of the grounds alleged by plaintiffs, however, are not expressly covered by the Franchise Security Law. As such, application of the covenant as to those grounds is not precluded by the actions of the General Assembly. The Court will address each in turn.

*Ground 1. Charging Unreasonable and Excessive Rent.* Simply stated, the Court cannot find that the mere charging of excessive and unreasonable rent violates the covenant. First, the Franchise Security Law covers all aspects of the charging of unreasonable and excessive rent once the franchise relationship exists. (FN13) In this respect, the Franchise Security Law covers and precludes this ground. Second, as the Court stated in its treatment of Count I, there is no law or public policy that prevents a potential franchisor from charging whatever rent it wishes to charge, *ab initio,* that is, as a precursor to entering into the franchise relationship. And the covenant certainly cannot be said to apply here, since no contract yet exists between the two parties. The Court is of the opinion that, as a matter of law, the first alleged ground cannot state a claim for a violation of the covenant.

*Ground 3. Failure to Consult Prior to Granting the Competing Franchises.* As a matter of law, the Court is unable to conclude that the parties, had they discussed this issue prior to entering into the relationship, would have agreed that Dunkin' would have to consult with plaintiffs prior to granting competing franchises. *See Pressman,* 679 A.2d at 443; *Katz,* 508 A.2d at 880. First, an opposite conclusion is evident from the arguments presented by Dunkin' in this case. Second, the Franchise Agreement specifically states areas in which Dunkin' agrees to maintain an advisory relationship with the franchisee. (FN14) Third, even if they had consulted, the parties would have had to agree on a definition of "competing franchise." This obviously entails some notion of territoriality, and it is by no means clear that the parties would have agreed as to a specific territorial radius within which a new franchise would be deemed "competing." (FN15) Fourth, there is little need to consult on the granting of a competing franchise if such consultation would be of little use. If the existing franchisee has no say or "veto power" over the proposed franchise, what good would prior consultation do, other than perhaps assuage any fears the existing franchisee might have? The Court is unable to conclude that this parental "hand holding" is a requirement of the covenant. For all four reasons the Court concludes that this ground cannot state a claim for a violation of the covenant.

*Ground 4. Failure to Offer Competing Franchises to Plaintiffs.* The Court is similarly unable to conclude, as a matter of law, that the parties, had they discussed the issue, would have agreed that Dunkin' should give plaintiffs what is effectively a right of first refusal on all competing franchises. First, the parties would have had to agree on the definition of a "competing franchise," which, as the Court stated above, involves other issues upon which the parties would have had to agree. Second, it would have been impossible for Dunkin' to offer the franchises to plaintiffs. The O'Hanlon shop was already owned by Sean O'Hanlon and was not a "new franchise" as the term is generally used, since it became a Dunkin' franchise through the Mr. Donut conversion program. The Pike

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

Creek shop was similarly unavailable to plaintiffs, since the eventual franchisee already had the lease for that site before approaching Dunkin' about opening a franchise.  These facts fail to state a claim under the covenant.

   **17** *Ground 5. Failure to Investigate Impact.*   As a matter of law, this ground fails to constitute a violation of the covenant.  The Franchise Agreement contains the procedures by which Dunkin' conducts an adverse impact analysis. (FN16)  Dunkin's adverse impact analysis cannot begin until the existing franchisee makes a call to his business consultant concerning the decline in sales.  Since the issue is expressly covered by the contract, the implied duty does not come into play.  *See Dave Greytak Enters.,* 622 A.2d at 23.  However, even assuming, *arguendo,* that this implied duty did come into play if Dunkin' failed to implement those procedures, the result here is not changed.  Plaintiffs claim that O'Connor attempted to invoke the procedures by calling Tom McHugh in August 1993 and that Dunkin' thereafter refused to invoke the designated procedures.  It is undisputed, however, that O'Connor did not make that "attempt" until *after* Dunkin' sent the first notice of termination to plaintiffs. Apparently plaintiffs believe that Dunkin' has a contractual duty to make an adverse impact analysis even after plaintiffs have failed to pay rent due (for whatever reason) and Dunkin' has begun termination proceedings.  Suffice it to say that the Court does not share that belief.

   Since the Franchise Agreement contained procedures for investigating possible adverse impact, there is no implied covenant imposing such a duty.  Moreover, since plaintiffs themselves admit that they did not attempt to invoke those procedures until after termination proceedings began, Dunkin' cannot be held responsible for any failure to investigate.

   *Summary.* By way of summation on this count, a review of all nine grounds alleged by plaintiffs as constituting a violation of an implied covenant of good faith and fair dealing leads the Court to the conclusion that plaintiffs have failed to state a claim for application of the covenant.  Summary judgment on Count XIII of the Second Amended Complaint is GRANTED.

*COUNT XIV*

   In Count XIV of the Second Amended Complaint, plaintiffs allege that Dunkin's obtaining and retaining unreasonable and excessive rental fees constitutes an unjust enrichment for which plaintiffs should be compensated.  However, unjust enrichment is a quasi-contract theory of recovery meant to remedy the absence of a formal contract.  *ID Biomedical Corp. v. TM Technologies, Inc.,* Del. Ch., C.A. No. 13269, Steele, V.C., 1995 Del. Ch. LEXIS 34 (Mar. 16, 1995), mem. op. at 26 (citing *Freedman v. Beneficial Corp.,* D. Del., 406 F.Supp. 917, 923 (1975)).  If a contract "is the measure of [the] plaintiffs' right," the parties cannot recover under a theory of unjust enrichment.  *See Wood v. Coastal States Gas Corp.,* Del.Supr., 401 A.2d 932, 942 (1979);  *Chrysler Corp. v. Airtemp Corp.,* Del.Super., 426 A.2d 845, 854 (1980);  *ID Biomedical Corp.,* mem. op. at 26-27. Here we have a formal contract between Dunkin' and plaintiffs which governs the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

relationship between them.  As such, no claim for unjust enrichment can exist. Summary judgment is GRANTED as to Count XIV of the Second Amended Complaint.

### DUNKIN'S COUNTERCLAIM

**\*\*18.** As the Court indicated in its earlier opinion, Dunkin's counterclaim essentially repudiates plaintiffs' entire complaint.  The crux of Dunkin's Motion for Summary Judgment on the counterclaim is that there is no genuine issue of material fact that plaintiffs stopped making payments for rent and fees under the Franchise Agreements and subleases in 1993.  This failure to pay money owed placed them in default under the franchise agreements and their failure to cure the defaults provided grounds for termination.

As Dunkin' argues, plaintiffs' first "excuse" for nonpayment, that Dunkin' breached its obligations to plaintiffs, is not a defense to termination because "a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor." *S & R Corp. v. Jiffy Lube, Int'l, Inc .*, 3d Cir., 968 F.2d 371, 375 (1992).  In other words, Dunkin' argues that any breach it may have committed against plaintiffs is a separate offense that does not entitle plaintiffs to avoid their own obligations under the agreement.  That is, assuming that plaintiffs were the non-breaching party, they may not stop their performance and yet continue to take advantage of the contract's benefits.  *Id.* at 376 (citing *Burger King, Inc. v. Austin,* S.D. Fla., Bus. Fin. Guide (CCH) ¶ 9788 at 22,089 (Dec. 26, 1990), in which the federal district court ruled against defendants on their allegation that Burger King's failure to give them required real estate assistance entitled them to stop paying royalties but continue to use the Burger King trademark).

The Court notes that both the *S & R Corp.* and *Burger King* cases cited here are somewhat inapposite, as each involved suits brought for trademark infringement under the Lanham Act.  Furthermore, neither case appears to have presented a situation, such as the one here alleged, where the default by the franchisee was alleged to be directly due to the franchisor's breach.  Consequently, while the language of these opinions could perhaps be read as widely as Dunkin' reads them, the Court doubts that they really mean to include a situation such as the one alleged by plaintiffs here.  (FN17)

Additionally, since the counterclaim is essentially a repudiation of the complaint, summary judgment is a particularly inappropriate remedy when the Court has already denied Dunkin's Motion for Summary Judgment with respect to some of the counts of the complaint.  For either reason, summary judgment on the counterclaim must be and hereby is DENIED.

### CONCLUSION

For all of the foregoing reasons, Dunkin's Motions for Summary Judgement are GRANTED with respect to Counts I, II, VI, IX, X, XI, XII, XIII, and XIV of the Second Amended Complaint;  DENIED with respect to Counts III, IV, V, VII, and

© 2007 Thomson/West. No claim to original U.S. Govt. works.

Page 22

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

VIII of the Second Amended Complaint;  and DENIED with respect to the counterclaim.  IT IS SO ORDERED.

 (FN1.) A satellite shop is a store where sales are permitted to be made but preparation and production of the foods is done off premises, i.e., at the Kirkwood shop.

 (FN2.) The stipulation was filed with the Prothonotary and signed by the Court on January 17, 1997.  This dismisses Counts XV through XVIII, those alleged against the O'Hanlon defendants, and the Court will not discuss them further. For obvious reasons, the Court will not discuss the O'Hanlon Defendants' Motion for Summary Judgment.  (Docket No. 117.)

 (FN3.) This ruling makes it unnecessary to consider Dunkin's argument that plaintiffs released any claims against Dunkin' by the signing of a general release in the sublease amendments executed in 1986 and 1987.  *See* Ex. 1C at ¶ 4, Ex. 1D at ¶ 3, Dunkin' Mot. for Summ. J. (Docket No. 115).  This applies to Count II as well, in light of the fact that Dunkin' makes this argument with respect to Count II.

 (FN4.) In *Kahn*, the plaintiffs alleged that defendants forced one of the parties into an agreement, and then interfered with the structuring of that agreement such that it was not negotiated at arm's length.  In response to a motion to dismiss the claim as being beyond the statute of limitations, plaintiffs argued that the wrongs were not time-barred because they were continuing.  The Court rejected this argument and distinguished those wrongs that occur at the contract-formation stage from those that occur later in the contractual relationship, and held that as to the former, the injured party has three years from the date of formation within which to bring the claim.

 (FN5.) Since Dunkin' has at least tacitly accepted plaintiffs' continuing wrong theory as *conceptually* valid, the Court has proceeded to treat it as such. There is something odd, however, with the notion that a breach of contract can constitute a continuing wrong.  The theory itself is more a creature of tort law.  *See* Mem. op. at 19 (Docket No. 63).  It would seem to the Court that contracts are rarely, if ever, really susceptible to the continuing wrong theory.  With respect to contracts, the cause of action, that is, the wrong, generally accrues at the time of the breach, not when the damage is sustained. 51 AM. JUR. 2D*Limitations of Actions* § 126.  Contrary to plaintiffs' assertions, here the *wrong* is the alleged refusal to renew the franchise;  the *damage* is the allegedly unreasonable or excessive amount.  The repeated payments of allegedly unreasonable or excessive rent are not so much continuing wrongs as they are continuing damages.

**18_  (FN6.) In pertinent part, 6 *Del C.* § 4906 states the following:  (a) Notwithstanding the terms, provisions or conditions of any franchise or notwithstanding the terms or provisions of any waiver, no manufacturer shall cancel, terminate or fail to renew any franchise with a licensed new motor

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

vehicle dealer....

(FN7.) Of particular value to the Court in reaching its decision on that issue was the fact that the franchise agreement, like here, did not purport to give the franchisee any guaranteed territory.

(FN8.) Based on the foregoing discussion, it is obvious that this Court disagrees with the general holdings of those cases cited by Dunkin' in which the courts declined to find a cause of action for constructive termination. *See Corp v. Atlantic-Richfield Co.,* Wash.Supr., 122 Wash.2d 574, 860 P.2d 1015, 1020 (1993); *Adolph Coors Co. v. Rodriguez,* Tex. Ct.App., 780 S.W.2d 477, 480 (1989). This disagreement is limited simply to the general issue of constructive termination. The Court, of course, takes no position regarding the interpretation of the franchise laws at issue there.

(FN9.) Plaintiff Opp. to Mot. for Summ. J. at 1 (Docket No. 120).

(FN10.) Consider the following colloquy:

Q: Do you have any fact[s] to substantiate that Dunkin' had some intention to harm your business?

A: No facts that I am aware of.

O'Connor Dep. at 338, Ex. 1G, Dunkin' Mot. for Summ. J. (Docket No. 115).

(FN11.) Note that the common law provides a remedy only for intentional misrepresentations. That is its great distinction from equitable fraud, which allows the Court of Chancery to provide a remedy for negligent or innocent misrepresentations. *Stephenson v. Capano Dev., Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983). The Consumer Fraud Act provides similarly sweeping coverage for misrepresentations. *See 6 Del. C.* § 2513.

(FN12.) The second ground appears to be covered by Count III; the sixth by Count V; the seventh by Count VI; the eighth by Counts IV and VIII; and the ninth by Count VII.

(FN13.) See the discussion with respect to Count I, *supra.*

(FN14.) "[Dunkin' Donuts agrees] To maintain a continuing advisory relationship with the FRANCHISEE, including consultation in the areas of marketing, merchandising, and general business operations...." Franchise Agreement at ¶ 3A, Ex. A, Dunkin' Mot. for Summ. J. (Docket No. 115).

(FN15.) Perhaps tellingly, the franchise agreement between Dunkin' and plaintiffs makes no mention of any exclusive territory for the franchisee.

(FN16.) The Franchise Agreements themselves are silent on the issue, but the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 529587, Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., In re, (Del.Super. 1997)

    agreements clearly refer to manuals which Dunkin' is to provide the franchisee. One such manual, the Dunkin' Donuts Site Development Guidelines Summary, describes all of the procedures for investigating adverse impact claims.

(FN17.) Dunkin' also argues that plaintiffs' second "excuse," that they ran out of money, is similarly not a defense to nonpayment. It argues that the undisputed evidence shows that plaintiffs' inability to pay was the direct result of O'Connor's misappropriation of company funds, which is clearly no defense to nonpayment. While the Court is mindful of this argument, it turns on the facts of this case regarding the books and records of the company and O'Connor's salary and expenditures, such as the so-called "salary supplements." Since the Court does not weigh the evidence at this stage, it is unpersuaded that no genuine issue of material fact exists regarding the reason for plaintiffs' nonpayment of fees.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

**TAB C**

Citation/Title
1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

**\*326686**    UNPUBLISHED OPINION.  CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

**Cantor FITZGERALD, L.P., Plaintiff,**

v.

**Iris CANTOR, Individually, and as De Facto Trustee of the Cantor Family Trust, and Iris Cantor as Trustee of the
Michelle Labozzetta Trust, Iris Cantor as Trustee of the Suzanne Fisher Trust, Iris Cantor as Trustee of the Howard
Lutnick Trust, Iris Cantor as Trustee of the Stuart Fraser Trust, Iris Cantor as Trustee of the Monica Muhart Trust,
and Iris Cantor as Trustee of the Randi Ross Trust, Cantor Fitzgerald Incorporated, Rodney Fisher, Market Data
Corporation and Chicago Board Brokerage, L.L.C., Defendants.**

**No. C.A. 16297.**
Submitted June 3, 1998.

Decided June 16, 1998.

Rodman Ward, Karen L. Valihura, Joseph M. Asher and George F. Fraley, III of
Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware, of counsel Thomas J.
Schwarz and Jeremy A. Berman of Skadden, Arps, Slate, Meagher & Flom, New York
City, for plaintiff.

Lawrence C. Ashby, Stephen E. Jenkins, Richard D. Heins and Richard I.G. Jones,
Jr. of Ashby & Geddes, Wilmington, Delaware, of counsel, Jack C. Auspitz and
Howard E. Heiss of Morrison & Foerster, New York City, Steven M. Weinberg of
Weinberg Sullivan, Phoenix, Arizona; Barry I. Slotnick, J. Lawrence Crocker and
Joshua T. Rabinowitz of Slotnick Shapiro & Crocker, New York City, David F.
Dobbins and Saul B. Shapiro of Patterson, Belknap, Webb & Tyler, New York City,
for defendants Iris Cantor, Cantor Fitzgerald Incorporated, Rodney Fisher and
Market Data Corporation.

Martin P. Tully and William Lafferty of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, of counel Josef J. Riemer, Ellen M. Moskowitz and Mark A.
Racanelli of Kirkland & Ellis, New York City, for defendant Chicago Board
Brokerage, L.L.C.

**MEMORANDUM OPINION**

STEELE, Vice Chancellor.

**\*\*1**  Cantor Fitzgerald, L.P. ("CFLP" or "Plaintiff"), a Delaware limited
partnership, alleges that three of its limited partners, working through a
Delaware corporation under their control and in conjunction with an unassociated
Delaware limited liability corporation, have developed a product that will
compete directly with CFLP's core business.  Plaintiff CFLP seeks a preliminary
injunction against all five defendants to prevent the new product's launch on
July 13, 1998.  Plaintiff may obtain a preliminary injunction if it establishes
the following three elements: (1) a reasonable likelihood of success on the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

merits, (2) imminent, irreparable harm will result if an injunction is not granted and (3) the damage to Plaintiff if the injunction does not issue will exceed the damage to the defendants if the injunction does issue.  (FN1) Decision on the application for a Preliminary Injunction is reserved until the record may be supplemented on the issues of the existence of imminent, irreparable harm and whether the balance of the equities favors the issuance of the injunction.

In the underlying Complaint, Plaintiff alleges breach of fiduciary duty, breach of contract and unjust enrichment claims against the three limited partners.  It alleges aiding and abetting, tortious interference and unjust enrichment claims against the Delaware corporation and limited liability company.  (FN2) Defendants have moved to dismiss all claims pursuant to Rule 12(b)(6) or for Judgment on the Pleadings pursuant to Rule 12(c). As to the fiduciary duty and contract claims, defendants' Motions to Dismiss and joint Motion for Judgment on the Pleadings are denied.  As to the unjust enrichment claims, the Motions to Dismiss/joint Motion for Judgment on the Pleadings are granted with respect to the three limited partners and denied with respect to the Delaware corporation and limited liability company.

## BACKGROUND

Plaintiff CFLP is a leading inter-dealer and institutional broker of United States Treasury securities and other government securities.  Three of the defendants in this action, Iris Cantor ("Cantor"), Rodney Fisher ("Fisher"), and Cantor Fitzgerald Incorporated ("CFI") (collectively "Limited Partner Defendants"), are Limited Partners in CFLP. Cantor, in addition to being a Limited Partner of CFLP, is also the Vice Chairman of CFLP and the owner (FN3) and CEO of CFI.

Market Data Corporation ("MDC"), a fourth defendant in this action, is a Delaware corporation in the business of distributing financial data and of licensing software and technology for electronic trading systems.  CFLP spun off MDC in 1987 in order to enhance the focus of MDC's business as a separate profit center.  Cantor is majority shareholder of MDC (FN4), and Fisher is MDC's Chairman and CEO.

The fifth defendant is Chicago Board Brokerage, L.L.C. ("CBB"), a Delaware limited liability company.  CBB is a joint venture of Ceres Trading Limited Partnership, a limited partnership controlled by the Chicago Board of Trade, and Prebon Yamane, a broker/competitor of CFI.  "CBB was formed to develop a new and more efficient way of brokering and trading Treasuries--through an interactive electronic trading system...."  (FN5)

**2  CFLP filed this action after CBB announced that, on July 13, 1998, it will launch a new electronic trading system called "MarketPower."  CFLP contends the new system is intended to compete directly against CFLP in its "historic core business"--the brokerage of U.S. Treasuries.  CBB concedes that, through MarketPower, it "intends to bring full and fair competition to the Treasuries market," which is currently "dominated by plaintiff CFLP." (FN6) CBB developed

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

the specifications for MarketPower and searched for approximately four years for a vendor to build the system.  Ultimately, CBB chose MDC as its vendor because "it committed to develop the software on a timetable acceptable to CBB and because [it] could produce the software on acceptable financial terms."  (FN7)

Although CBB did not sign a formal contract with MDC until February 9, 1998, and did not announce the impending launch of MarketPower until March 19, 1998, CFLP learned from one of its employees that MDC was close to signing a contract with CBB to develop an electronic trading system at least as early as September of 1997.  On October 6, 1997, CFLP sent a letter to Cantor, Fisher and MDC objecting to MDC's role as CBB's software vendor.  CFLP claimed that the activity constituted a breach of the 1996 Agreement of Limited Partnership of Cantor Fitzgerald, L.P. ("1996 Limited Partnership Agreement" or "1996 Agreement"). CFLP knew that its warnings were going unheeded, however, in November of 1997, when a CFLP employee attended a high-profile, industry-wide, public demonstration of the MarketPower software that MDC built for CBB. Plaintiff did not initiate this action until April 6, 1998.

Plaintiff never expressed any concern directly to CBB about the propriety of using MDC as CBB's software vendor.  Nevertheless, CBB learned of the allegations in CFLP's October 6, 1997, letter through MDC. Fisher assured CBB, however, as he had from the start of the companies' negotiations in June of 1997, that CFLP and MDC were separate companies and that CFLP's allegations were baseless.  In fact, the Agreement Between Chicago Board Brokerage, L.L.C., and Market Data Corporation (the "CBB/MDC Software Licensing Agreement") provides that if CFLP ever materially interferes with MDC's participation in the CBB/MDC deal, MDC will be in material breach of the CBB/MDC Software Licensing Agreement, and CBB may terminate the agreement and look to its rights as stated in paragraphs 8.3 and 11.3.  Thus, between October of 1997, and April of 1998, in reliance on MDC's assurances, CBB "made substantial commitments ... to prepare for the launch of MarketPower, including hiring more staff and undertaking the significant task of building a network to support the system."  (FN8) Despite seeing caution flags waved, CBB intends to launch as scheduled, on July 13, 1998.

### CONTENTIONS OF THE PARTIES

Count I of the Complaint alleges that the Limited Partner Defendants, by allowing or causing MDC to collaborate with CBB to develop and sell a product intended to compete directly against CFLP in its "historic core business," breached a fiduciary duty of loyalty owed to CFLP and breached section 3.03(b) of the 1996 Limited Partnership Agreement.  Count III of the Complaint alleges that Cantor and CFI breached section 3.03(a) of the 1996 Agreement.  Counts II and IV of the Complaint, respectively, allege that MDC and CBB, by collaborating on the development and sale of MarketPower, aided and abetted the Limited Partner Defendants' breach of their duty of loyalty and tortiously interfered with the 1996 Limited Partnership Agreement.  Count V alleges a claim of unjust enrichment against all five defendants.

**3**  Shortly after filing the Complaint, CFLP filed a Motion for Preliminary

© 2007 Thomson/West. No claim to original U.S. Govt. works.

Page 4

1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

Injunction to prevent the July 13, 1998, launch of MarketPower.  CFLP contends
that it has at least a reasonable likelihood of success on the merits, based on
its interpretation of the 1996 Limited Partnership Agreement and based on
Delaware's case law concerning the fiduciary duty of loyalty and accomplice
liability.  CFLP also contends that, if MarketPower is allowed to be released in
July, CFLP will suffer irreparable harm in the form of, *inter alia,* loss of
customers and of market share.  Finally, CFLP argues that the harm it will suffer
if the Court refuses to issue an injunction substantially outweighs the harm that
defendants will suffer if the Court grants the injunction.  All five defendants
contest Plaintiff's arguments and oppose the Motion for Preliminary Injunction.

Fisher, MDC and CBB have filed Motions to Dismiss the Complaint for failure to
state a claim.  Because Cantor and CFI had already filed their Answer, they were
prohibited from filing a Motion to Dismiss and instead filed a joint Motion for
Judgment on the Pleadings ("J.O.P.").  Rather than respond to the defendants'
Motions to Dismiss/Motion for J.O.P. directly, CFLP filed a Motion for Leave to
File Amended Complaint.  CFLP contends that the proposed Amended Complaint has
fixed any problems that may have existed in the original Complaint.  As to the
defendants who have not yet filed a responsive pleading, CFLP may amend the
Complaint as of right.  (FN9) However, with respect to Cantor and CFI, CFLP must
obtain this Court's permission to file an Amended Complaint.  (FN10)

This Court liberally grants motions to amend "unless there is a showing of
substantial prejudice or legal insufficiency."  (FN11) Cantor and CFI oppose
CFLP's Motion to Amend on the basis of legal insufficiency.  The standard for
assessing the legal sufficiency of a proposed Amended Complaint is the same
standard applicable to a Motion to Dismiss.  (FN12) Therefore the Court's
decision on defendants' Motions to Dismiss, which follows, implicitly decides
Plaintiff's motion to amend the Complaint as well.

### THE 1996 LIMITED PARTNERSHIP AGREEMENT

Section 3.03(b) of the 1996 Limited Partnership Agreement states:

"Each Partner acknowledges its duty of loyalty to the Partnership and agrees to
take no action to harm (or that would reasonably be expected to harm) the
Partnership or any Affiliated Entity."

The Limited Partner Defendants are "Partners," (FN13) and Plaintiff contends
they are, as a result, bound by the terms of section 3.03(b).  CFLP contends that
the Limited Partner Defendants, by allowing MDC to contract with CBB to develop a
product that will compete with CFLP in its core business, breached their
fiduciary duty of loyalty to CFLP and took an action that would reasonably be
expected to harm CFLP.

Section 3.03(a) states, in pertinent part:

"Nothing contained in this Agreement shall be deemed to preclude the Managing
General Partner, CFI or any of their respective Affiliates from engaging or

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; *provided,* that such activities do not constitute Competitive Activities." (FN14)

**\*\*4** The 1996 Agreement states that " 'Competitive Activity' shall have the meaning given in Section 11.04(c)." Section 11.04(c) states, in pertinent part:

"[A] Partner shall be considered to have engaged in a Competitive Activity if such Partner while a Partner ...

(ii) solicits any of the customers of the Partnership or any Affiliated Entity (or any of their employees), induces such customers or their employees to reduce their volume of business with, terminate their relationship with or otherwise adversely affect their relationship with, the Partnership or any Affiliated Entity ...

(iv) directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of the Partnership or of any Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business or

(v) assists others in engaging in any Competing Business in the manner described in the foregoing clause (iv)." (FN15)

CFLP contends that the Limited Partner Defendants, by allowing or causing MDC to help CBB develop and sell MarketPower, have: (1) "solicit[ed] the customers of CFLP to reduce their volume of business with CFLP" in violation of section 11.04(c)(ii), (2) "directly engag[ed] in a Competing Business" in violation of section 11.04(c)(iv) and (3) "assist[ed] others in engaging in [a] Competing Business" in violation of section 11.04(c)(v). (FN16)

* * *

* * *

This is the Court's decision on defendants' Motions to Dismiss and joint Motion for J.O.P.

## DISCUSSION

A cause of action may be dismissed pursuant to Rule 12(b)(6) for failure to state a claim when, assuming the truth of all well-pleaded facts in the Complaint and construing all inferences to be drawn from those facts in the light most favorable to the non-moving party, the Court is convinced that there is no set of facts under which the plaintiff would be entitled to relief. (FN17) The Court may consider facts contained in documents incorporated into the complaint by reference when deciding a motion to dismiss. (FN18) The 1996 Limited Partnership

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

Agreement and the CBB/MDC Software Licensing Agreement are incorporated by reference into CFLP's Amended Complaint.

   The legal standard applicable to a Motion for J.O.P. differs from the standard applicable to a Motion to Dismiss.  Although the Court is still required to assume the truth of all well-pleaded facts in the Complaint and to construe all inferences to be drawn from those facts in the light most favorable to the non-moving party, just as on a motion to dismiss, "[a] motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."  (FN19)

   Counts I and III of the Amended Complaint allege that the Limited Partner Defendants breached their duty of loyalty to CFLP and the 1996 Limited Partnership Agreement.  The 1996 Agreement clearly states that all Limited Partners owe CFLP a duty of loyalty and agree to take no action that would reasonably be expected to harm CFLP. The Agreement also states that CFI and its Affiliates may not engage in Competitive Activities or Competing Businesses.  The Amended Complaint alleges that the Limited Partner Defendants, while Limited Partners of CFLP, allowed MDC to contract with CBB to develop and sell a product that will compete directly against CFLP in its core business of brokering U.S. Treasuries.  The underlying facts, stated in the Amended Complaint, if true, would seem to support an inference of (a) a breach of the Limited Partners' duty of loyalty, (b) harm to CFLP, (c) a Competitive Activity and (d) a Competing Business.

   **5  The Limited Partner Defendants contend, among other arguments, that regardless of the 1996 Limited Partnership Agreement's terms (FN20), they have earned the right to allow or cause MDC to compete with CFLP through a prior course of dealing.  They contend that since 1993, the year CFLP first inserted the language currently found in sections 3.03(a), 3.03(b) and 11.04(c) of the 1996 Agreement, MDC has completed, or has proposed and negotiated, many transactions with CFLP's competitors that would arguably constitute Competitive Activities or Competing Businesses, or that might arguably be considered a violation of the Limited Partner Defendants' duty of loyalty and harmful to CFLP. Defendants contend that Plaintiff never objected to, or sought to enjoin, these dealings, notwithstanding that some allegedly involved the development of electronic trading systems for companies that compete directly with CFLP in the fields of mortgage-backed securities and emerging markets, as well as in CFLP's core business of U.S. Treasuries.

   The Limited Partner Defendants may prevail on their theory after a full trial on the merits.  On the very limited record before me, however, and construing all reasonable inferences in the light most favorable to CFLP, I cannot say with certainty that there is no set of facts under which CFLP would be entitled to relief.  Thus, Fisher's Motion to Dismiss Counts I and III is denied.  Similarly, whether Cantor and CFI may allow or cause MDC to compete with CFLP, despite the terms of the 1996 Agreement, because of the parties' prior course of dealing is a disputed material fact that precludes this Court from entering judgment on the pleadings.  Cantor's and CFI's joint Motion for J.O.P. on counts I and III is

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

denied.

Counts II and IV raise accomplice liability theories against MDC and CBB. Count II is a claim for aiding and abetting the Limited Partner Defendants' breach of fiduciary duty, and Count IV is a claim for tortiously interfering with the 1996 Limited Partnership Agreement.  The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant.  (FN21) The elements of tortious interference are: (1) a contract, (2) defendant's knowledge of the contract, (3) an intentional act that is a significant factor in causing the breach of the contract, (4) lack of justification and (5) injury.  (FN22)

A common basis for dismissing accomplice liability theories under Rule 12(b)(6) is that Plaintiff has stated no underlying claim for principal liability.  As I have explained, however, the Amended Complaint does state a claim for breach of the duty of loyalty expressly inserted in the 1996 Limited Partnership Agreement. Defendants contend, nevertheless, that Counts II and IV must be dismissed because Plaintiff has stated no facts to support the elements of knowing participation or of intentional action without justification.  I disagree.  Plaintiff has pleaded sufficient facts to support these elements of its respective claims.

**6  Plaintiff alleges that MDC and CBB agreed to work together to develop and sell a product that would compete directly with Plaintiff's core business.  It alleges that the product is operable and is set to launch on July 13, 1998. Certain Defendants admit in their pleadings that customers are currently being solicited to use the product.  MDC received a letter explaining that such a relationship/product would constitute a breach of the Limited Partner Defendants' duty of loyalty found in the 1996 Limited Partnership Agreement.  Plaintiff has alleged that MDC shared this information with CBB and that, in response, CBB required MDC to agree to indemnify CBB in the event that Plaintiff should obtain "against MDC any final and unappealable permanent injunction, court order or settlement of any litigation...."  (FN23)

Under these circumstances, the Court may infer that MDC and CBB had reason to believe that developing and marketing MarketPower may constitute a breach of the Limited Partner Defendants' duty of loyalty found in the 1996 Limited Partnership Agreement.  The Court may further infer that MDC's and CBB's continued development and marketing of MarketPower in the face of their knowledge lacked justification.  Accordingly, defendants' Motions to Dismiss Counts II and IV are denied.

Finally, all five defendants have moved to dismiss Count V, which alleges a cause of action for unjust enrichment.  Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  (FN24) The elements of unjust enrichment have also been stated in this way: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

Page 8

1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

absence of a remedy provided by law.  (FN25)

  The Limited Partner Defendants argue that a cause of action for unjust enrichment does not lie when a contract determines the obligations between the parties.  (FN26) However, the Amended Complaint specifically states: "In the alternative, and/or with respect to conduct *not governed by the existence of an express contract,* CFLP seeks the equitable remedy of unjust enrichment."  (FN27) Thus, unless and until this Court determines that the defendants' obligations are governed exclusively by contract, Plaintiff has properly stated a claim for unjust enrichment.

  I do, however, find that the claims against the Limited Partner Defendants are governed exclusively by contract and that, as to them, the Motions to Dismiss/ joint Motion for J.O.P. must be granted with respect to Count V. Whether or not there is an implied duty of loyalty which applies to limited partners generally and prohibits the conduct complained of here is not an issue.  Here, by contract, within the 1996 Limited Partnership Agreement, the parties accepted the invitation of 6 *Del.C.* § 17-1101(d) to address fiduciary duties.  The 1996 Agreement is certainly not silent on the subject.  Therefore, it may be fairly assumed that the parties intended the nature and scope of the fiduciary duties owed, by whom to whom, to be addressed within the language adopted by them in their own freely-fashioned agreement.  This Court repeatedly has emphasized that Delaware law favors allowing parties to an agreement to pursue their own aims so long as no underlying fraud or innocent misrepresentation taints the crafting of the language actually adopted.  (FN28) This is consistent with the policy of the General Assembly expressed in 6 *Del.C.* § 17-1101(c).

  **7.** Cantor's and CFI's joint Motion for J.O.P. with respect to Count V is granted.  Fisher's Motion to Dismiss Count V is granted.

  The claims against CBB and MDC are not governed by any contract with CFLP. The Amended Complaint states a claim that survives CBB's and MDC's Motions to Dismiss.  Plaintiff repeatedly alleges that, if MarketPower is a success, defendants will be enriched, and Plaintiff will be impoverished.  Plaintiff also alleges that neither defendant can retain any benefit resulting from the success of MarketPower "justifiably" or in accordance with "the fundamental principles of justice or equity and good conscience," because they knew that Cantor, Fisher, and CFI were prohibited from producing a product that would compete with Plaintiff's core business.  Assuming the truth of these facts, as I must at this stage, I find that Plaintiff has stated a claim that survives CBB's and MDC's Motions to Dismiss.  CBB's and MDC's Motion to Dismiss Count V is denied.

**CONCLUSION**

  Plaintiff's Motion for Leave to File Amended Complaint is *granted.* Defendants' Motions to Dismiss the Amended Complaint/joint Motion for J.O.P. are *granted, in part, and denied, in part.* Decision on Plaintiff's Motion for a Preliminary Injunction is *reserved* until the record is supplemented, on July 6 - 8, 1998, on the issues of the existence of imminent, irreparable harm and whether the balance

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

of the equities favors the issuance of the injunction.

**IT IS SO ORDERED.**

(FN1.) *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1279 (1988).

(FN2.) At the parties' request, this Opinion does not address four additional counts of the Complaint.

(FN3.) Cantor owns CFI through the Iris Cantor Trust, of which Cantor is grantor, trustee and sole beneficiary.

(FN4.) Cantor is the majority shareholder of MDC through the Iris Cantor Trust.

(FN5.) CBB's Memorandum of Law is Support of Its Motion to Dismiss the Complaint at 2-3 (hereafter "CBB's Open. Dismiss Br.").

(FN6.) CBB's Open. Dismiss Br. at 3.

(FN7.) CBB's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction at 4 (hereafter "CBB's Opposing P.I. Br.").

(FN8.) CBB's Opposing P.I. Br. at 8.

(FN9.) Ct.Ch.R. 15(a).

(FN10.) Ct.Ch.R. 15(a). A party may also amend its complaint by written consent of the adverse party, but there has been no written consent in this case.

(FN11.) *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* Del.Ch., C.A. No. 13950, 1996 WL 189435 at *3, Allen, C. (Apr. 16, 1996).

(FN12.) *Moore Business Forms, Inc. v. Cordant Holdings Corp.,* Del.Ch., C.A. No. 13911, 1995 WL 707877 at *2, Jacobs, V.C. (Nov. 30, 1995).

(FN13.) The 1996 Agreement of Limited Partnership of Cantor Fitzgerald, L.P., § 1.01 (hereafter "1996 Limited Partnership Agreement"), defines "Partner," in part, as "the General Partners and the Limited Partners."

(FN14.) 1996 Limited Partnership Agreement § 3.03(a) (italics in original). Cantor and MDC appear to be Affiliates of CFI.1996 Limited Partnership Agreement § 1.01. (defining "Affiliate" as any person or entity "that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified [person or entity]").

(FN15.) A Competing Business: "(i) involves the conduct of the wholesale or institutional brokerage business, (ii) consists of marketing, manipulating or distributing financial price information of a type supplied by the Partnership

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

or any Affiliated Entity to information distribution services or (iii) competes with any other business conducted by the Partnership or any Affiliated Entity if such business was first engaged [in] by the Partnership or an Affiliated Entity...." 1996 Limited Partnership Agreement § 11.04(c).

(FN16.) Plaintiff's Opening Brief in Support of Its Motion for Preliminary Injunction at 15.  The quotation includes Rodney Fisher, but CFLP has apparently since conceded that § 3.03(a) of the 1996 Agreement does not apply to Fisher.

(FN17.) *Union Texas Petroleum Holdings, Inc. v. Travelers Indem. Co.,* Del.Ch., C.A. No. 15548, 1998 WL 83068 at *3, Chandler, C. (Feb. 19, 1998).

**7_  (FN18.) *See e.g.,  In re Santa Fe Pacific Corp. Shareholder Litigation,* Del.Supr., 669 A.2d 59, 69-70 (1995) (considering joint and supplemental proxy statements on motion to dismiss disclosure action and suggesting appropriateness of considering underlying contract in action for its breach).

(FN19.) *Desert Equities v. Morgan Stanley,* Del.Supr., 624 A.2d 1199, 1205 (1993).

(FN20.) The Limited Partner Defendants also contend that the 1996 Agreement, when considered in the context of its drafting history, permits them to take precisely the actions CFLP complains of in this action.  This argument is more appropriately considered next month, when the record concerning all three elements of the Preliminary Injunction standard is complete.

(FN21.) *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del.Ch., C.A. No. 13950, 1995 WL 694397 at *15, Allen, C. (1995).

(FN22.) *See CPM Indus. v. Fayda Chems. & Minerals, Inc.,* Del.Ch., C.A. No. 15996, 1997 WL 770683 at *7, Jacobs, V.C. (Nov. 26, 1997).

(FN23.) Agreement Between Chicago Board Brokerage, L.L.C., and Market Data Corporation §§ 2.9, 8.3, 11.3.

(FN24.) *Fleer Corp. v. Topps Chewing Gum, Inc.,* Del.Supr., 539 A.2d 1060, 1062 (1988).

(FN25.) *Khoury Factory Outlets, Inc. v. Snyder,* Del.Ch., C.A. No. 11,568, 1996 WL 74725 at *11, Kiger, M. (Jan. 8, 1996).

(FN26.) See *ID Biomedical Corp. v. TM Techs., Inc.,* Del.Ch., C . A. No. 13269, 1995 WL 130743 at *15, Steele, V.C. (Mar. 16, 1995), for a discussion of this principle.

(FN27.) Proposed Amended Complaint ¶ 113 (emphasis added).

(FN28.) *See, e.g.,   In re Cencom Cable Income Partners, L.P. Litig.,* Del.Ch.,

© 2007 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 326686, Fitzgerald v. Cantor, (Del.Ch. 1998)

C.A. No. 14634, 1997 WL 666970 at *4, Steele, V . C. (Oct. 15, 1997); ***In re Cencom Cable Income Partners, L.P. Litig.,*** Del.Ch., C.A. No. 14634, 1996 WL 74726 at *4-5, Steele, V.C. (Feb. 15, 1996).

© 2007 Thomson/West. No claim to original U.S. Govt. works.